# EXHIBIT A

FAX FILED

Duffy Carolan (SBN 154988)
JASSY VICK CAROLAN LLP
400 Montgomery Street, Suite 200
San Francisco, California 94104
Tel: (415) 539-3399
Fax: (415) 539-3394
dcarolan@jassyvick.com

Jean-Paul Jassy (SBN 205513)
Kevin L. Vick (SBN 220738)
6605 Hollywood Blvd., Suite 100
Los Angeles, California 90028
Tel: (310) 870-7048
Fax: (310) 870-7010
jpjassy@jassyvick.com
kvick@jassyvick.com

Attorneys for Plaintiff
STEPHEN ERNEST EBERHARD

ENDORSED FILED

MAR 2 7 2014

CLERK OF MENDOCINO COUNTY
SUPERIOR COURT OF CALIFORNIA

JOHN LOZANO

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF MENDOCINO

SC: UN CVPO '1463802

STEPHEN ERNEST EBERHARD

Plaintiff,

v.

CALIFORNIA HIGHWAY PATROL,
CALIFORNIA DEPARTMENT OF
TRANSPORTATION, CALIFORNIA
HIGHWAY PATROL OFFICER
CHRISOPHER W. DABBS, CALIFORNIA
HIGHWAY PATROL OFFICER KORY A.
REYNOLDS, CALIFORNIA HIGHWAY
PATROL OFFICER TEDDY M. BABCOCK,
CALIFORNIA HIGHWAY PATROL
CAPTAIN JAMES T. EPPERSON,
CALIFORNIA HIGHWAY PATROL CHIEF
BRIDGET T. LOTT, CALIFORNIA
DEPARTMENT OF TRANSPORTATION
DISTRICT 1 DIRECTOR CHARLIE
FIELDER, DOES 1-25

Defendants.

Case No.

COMPLAINT FOR VIOLATION OF
FIRST, FOURTH AND FOURTEENTH
AMENDMENTS TO THE UNITED
STATES CONSTITUTION [42 U.S.C. §
1983]; VIOLATION OF THE PRIVACY
PROTECTION ACT OF 1980 [42 U.S.C. §
2000aa]; FALSE ARREST AND FALSE
IMPRISONMENT; VIOLATION OF
CIVIL RIGHTS/BANE ACT [CAL. CIV.
CODE § 52.1]; UNNECESSARY DELAY IN
PROCESSING ARREST AND
RELEASING PLAINTIFF; INTENTIONAL
INFLICTION OF EMOTIONAL
DISTRESS; DECLARATORY RELIEF
[CIV. PROC. CODE § 1060]

[JURY TRIAL DEMANDED]

FAX FILED

1

COMPLAINT

1

**INTRODUCTION**

2      1.      This action stems from a consistent pattern of harassment and intimidation by
3  personnel of the California Highway Patrol ("CHP") and California Department of Transportation
4  ("CALTRANS") aimed at retaliating against and chilling, the valid exercise of state and federal
5  constitutional rights to record, report on and gather information about important matters of public
6  interest pertaining to a controversial highway construction project called the Willits Bypass Project
7  in Willits, California. After months of intimidation and harassment of the press, including threating
8  journalists with arrest for doing their job, monitoring and controlling the press's access to public
9  places, falsely portraying the press as protesters and, in one instance, assault and battery on a
10 journalist, the events at issue here culminated in the warrantless arrest without probable cause of
11 The Willits News Photojournalist STEPHEN ERNEST EBERHARD ("Eberhard"), in the early
12 morning hours of July 23, 2013, in the course of carrying out his newsgathering duties for the paper
13 on public property where about a dozen individuals had gathered to protest the project and where
14 two people had locked themselves to construction equipment on the site in protest. This action also
15 arises from the warrantless seizure of Eberhard's newsgathering materials, including his cameras,
16 cell phone with source contact information, and journalist notepad, in violation of state and federal
17 law; the intentional delay in processing Eberhard to further intimidate him and chill his speech
18 rights; and, after his arrest, a concerted effort between CHP and CALTRANS personnel to falsely
19 represent the facts of the arrest in the press and to falsely portray Eberhard within his own
20 journalistic community as a protester in order to destroy his credibility as a neutral fact gatherer in
21 retaliation for and to chill the exercise of his state and federal constitutional rights.

22

**JURISDICTION**

23     2.      This Court has jurisdiction over this action pursuant to Code of Civil Procedure
24 Sections 395, 410.10, 410.50, 526 and 1060, and Civil Code Section 52.1(c) (Bane Act).

25     3.      Venue is proper in this Court pursuant to Civil Code Section 52.1(c), Government
26 Code Section 955.2, and Code of Civil Procedure Sections 393(b) and 395(a).

27     4.      All prerequisites to bringing suit, including those imposed by California Government
28 Code §§ 910 et seq. (California Government Tort Claims Act), if any, have been satisfied.

2

COMPLAINT

PARTIES

5. Plaintiff STEPHEN ERNEST EBERHARD ("EBERHARD") is a photojournalist for The Willits News ("TWN") in Willits, California, and a resident of Willits, California. He is a credentialed member of the press through the California Sherriff's Office, County of Mendocino and TWN. At all relevant times herein Eberhard was wearing around his neck on lanyards visible press credentials issued by the Mendocino County Sheriff's Department and TWN, and carrying two large cameras used in the course of carrying out his job duties of gathering information for dissemination to the public.

6. Defendant CHP is a state agency primarily responsible for enforcement of the California Vehicle Code and for coordinating with other local and state agencies for the protection of state property and infrastructure. CHP employs Defendants Officer Christopher W. Dabbs, Officer Kory A. Reynolds, Officer Teddy M. Babcock, Captain James T. Epperson and Doe officers and officials.

7. Defendant CALTRANS is a state agency primarily responsible for the state's transportation infrastructure, including highways and freeways. It is the agency overseeing the construction of the freeway bypass project. CALTRANS employs Charlie Fielder and Doe CALTRANS employees. It is believed and herein alleged that CALTRANS Doe employees established policies, practices and procedures for press access to the bypass project area and provided direction to CHP personnel for carrying out same.

8. Defendant CHP Officer CHRISTOPER W. DABBS ("Dabbs") is and at all times herein was a duly appointed officer of the CHP, badge number 019541. Defendant Dabbs participated in the unlawful arrest of Eberhard and seizure of his newsgathering materials, including his cameras, cell phone and journalist note pad, as alleged herein. He is also responsible, in whole or in part, for the delay in processing Eberhard's arrest, incarceration rather than immediate release upon issuance of a citation, and the falsification of an arrest report. Dabbs' actions, as alleged in this Complaint, were taken under color of law and in the course and scope of his employment.

9. Defendant CHP Officer KORY A. REYNOLDS ("Reynolds") is and at all times herein was a duly appointed officer of CHP, badge number 14642. Defendant Reynolds participated

3

1  in the unlawful arrest of Eberhard and seizure of his newsgathering materials, including his cameras,
2  cell phone and journalist notepad, as alleged herein. He is also responsible, in whole or in part, for
3  the delay in processing Eberhard's arrest, incarceration rather than immediate release upon issuance
4  of a citation, and the subsequent falsification of an arrest report. Reynolds' actions, as alleged in
5  this Complaint, were taken under color of law and in the course and scope of his employment.

6       10.    Defendant CHP Officer TEDDY M. BABCOCK ("Babcock") is and at all times
7  herein was a duly appointed officer of CHP. He is responsible for committing an assault and battery
8  on Eberhard, and other conduct undertaken with the intent to and effect of chilling the valid exercise
9  of Eberhard's First Amendment and state constitutional free speech rights. Babcock's actions, as
10 alleged in this Complaint, were undertaken under color of law and in the course and scope of his
11 employment.

12      11.    Defendant CHP Captain JAMES T. EPPERSON ("Epperson") is and at all times
13 herein was a duly appointed Captain of CHP. Epperson is responsible for training, supervising,
14 directing and controlling the officers under his supervision and command, including Dabbs,
15 Reynolds and Babcock. He was at all times herein alleged aware of harassment, intimidation and
16 threats of arrest made by CHP officers under his command against individual members of the press,
17 including Eberhard, yet he failed to prevent that harassment and intimidation, and instead condoned,
18 ratified, directed, acquiesced in, participated in, and encouraged it, causing, in whole or in part, the
19 harassment and intimidation and ultimate arrest of Eberhard.

20      12.    Defendant CHP Chief BRIDGET T. LOTT ("Lott") is and at all times herein was a
21 duly appointed Chief of CHP and the Northern Division Commander of CHP. She is responsible, in
22 whole or in part, for knowingly making false representations in the press and to Eberhard's peer
23 communities about his arrest in an attempt to discredit Eberhard and to harm his reputation as a
24 neutral fact gatherer and thereby deter or chill the valid exercise of this First Amendment and state
25 constitutional free speech rights.

26      13.    Defendant CALTRANS Director Charlie Fielder is and at all times herein was a duly
27 appointed Director of CALTRANS District 1. He was at all times herein alleged aware of the
28 harassment, intimidation and threats of arrest made by CHP officers against individual members of

4

1    the press, including Eberhard, and he authorized, ratified, condoned and/or directed the conduct of
2    CHP personnel acting on behalf of or at the behest of CALTRANS and the property owner, which
3    caused, in whole or in part, the harassment and intimidation and ultimate warrantless arrest without
4    probable cause of Eberhard. He also is responsible, in whole or in part, for making knowingly false
5    representations in the press and to Eberhard's peer communities about his arrest in an attempt to
6    discredit Eberhard and to harm his reputation as a neutral fact gatherer, and thus deter or chill the
7    valid exercise of his First Amendment and state constitutional rights.

8                                             **FACTS**

9    **A. The Willits Bypass Project.**

10          14.     The Willits Bypass Project is a four-year, $210 million highway construction project
11    involving a 5.9 mile long, four-lane freeway around the City of Willits. It impacts an area known as
12    the Little Lake Valley, a historical cultural resource site where thousands of American Indians once
13    resided, and covers more than 80 acres of sensitive wetlands. The project, first proposed in the
14    1950s, necessitated issuance of one of the largest wetland fill permits in Northern California history.
15    Construction on the project began in February of 2013 and involved, among other things, clearing
16    the site of trees and vegetation and pilling 85-foot long wick drains deep into the ground about every
17    five feet to drain the wetland area. The project has prompted two lawsuits, one brought by
18    conservation groups in the Northern District of California attempting to halt the project, and another
19    that sought to enjoin the transfer of fill to the site, which was brought to the attention of the public
20    by a photograph taken by Eberhard and published in TWN. Not surprisingly, the project has been
21    highly controversial, sparking public debate and public protests, including but not limited to
22    peaceful, picketing-style protests along the Highway 101 corridor, public lands adjacent to the site
23    and on public land in the area of the project. Several individuals have been arrested after lengthy
24    sit-ins in trees set to be removed as part of the project and others after chaining themselves to
25    construction equipment to impede the project and in protest of it. Since construction on the project
26    began in February 2013, more than 50 arrests, involving more than 30 individuals, have been made
27    by CHP.

28

1    15.    Most recently, in October of 2013, the Sherwood Valley Band of Pomo Indians, an

2  organization of American Indian tribes, called on the United States Congress to halt work on the

3  project after CALTRANS construction crews installed deep drains on what is believed to be part of

4  a historical cultural site, possibly causing harm to cultural resources.

5    16.    Thus, the Willits Bypass Project is highly newsworthy and has been the subject of

6  extensive media coverage, including but not limited to coverage by TWN, a bi-weekly newspaper

7  circulated throughout the Willits area.

8  **B.    Pattern of Harassment and Intimidation of the Press by CHP and CALTRANS leading
     up to July 23, 2013 Unlawful Arrest of Eberhard.**

9

10    17.    When construction began on the Willits Bypass Project, protests took place in areas

11  adjacent to the site along the public right-of-way abutting Highway 101, and within the route of the

12  new highway, which is on public land owned by the State of California. Initially, five individuals

13  staged protests by occupying trees within the new bypass route, adjacent to Highway 101. When the

14  press, including TWN Editor Linda Williams, Publisher Debbie Clark and Photojournalist Eberhard,

15  tried to cover these events they were threatened with arrest by CHP officers if they did not

16  immediately leave the area, which was unmarked and without any fencing to impede access.

17    18.    The threats of arrest were not limited to the bypass project footprint. Williams and

18  Clark also were instructed to vacate the premises of the CALTRANS' office parking lot when they

19  went to the Willits office to obtain a briefing from CALTRANS on the scope of police activities.

20  The office was then shared with CHP personnel assigned to the bypass project. They were told

21  through a CALTRANS' spokesperson that Ukiah CHP Post Commander Captain Epperson had

22  directed that they be instructed to leave the premises.

23    19.    And, on separate occasions in March and early April of 2013, Williams was

24  threatened with arrest by CHP personnel if she did not leave immediately when she was attempting

25  to cover newsworthy events relating to the bypass project while standing on the shoulder of a city

26  street, while parked alongside a county road and a state highway, in addition to areas purported to be

27  within the construction zone of the project.

28

6

COMPLAINT

20.   During this same time period, Eberhard similarly was subject to harassment, intimidation and threats of arrest while attempting to cover newsworthy events while on public property, including the public right of way adjacent to Highway 101 and along-side county roads. The incidents of intimidation and harassment include, but are not limited to, the following:

- On April 2, 2013, CHP moved in with about 60 officers dressed in riot gear and a team of SWAT officers to extract 5 protesters who had placed themselves in trees, starting with one known as the Warbler. Eberhard was on the scene to document the extraction for TWN. When a CHP officer learned of his presence, he was told to leave. Eberhard showed the officer his TWN press credential. The officer then called on the radio and spoke with a commanding officer, explaining that Eberhard had a press pass. The commanding officer nevertheless told the officer to "get him out of here" or words to that effect. Eberhard then showed the officer his press credential issued from the Mendocino County Sheriff's Office, and the officer again radioed the commanding officer and said that Eberhard had a Mendocino County Sheriff's press credential. The commanding officer again responded, "get him out of here." Though it was known to the officer that Eberhard was a credentialed member of the press on site to gather information for dissemination to the public, and not a member of any protest contingent, the officer then told Eberhard to leave the area or he'd be arrested.

- Later that morning, when Eberhard attempted to photograph from the public right-of-way along Highway 101 CHP's treatment of two of the protesters who, along with the Warbler, were being arrested by CHP personnel, Eberhard was again threatened with arrest by a CHP officer, in front of several other officers, if he did not return to the other side of the highway where he could not readily see the arrest activity. On this occasion, as on numerous other occasions, CHP had its own publicity photographer on the scene. Instead of recording CHP's performance of their duties in arresting the protesters, the CHP photographer stood near the arrest activity and photographed Eberhard attempting to photograph the officers' treatment of the protesters as they struggled to arrest them.

7

○ On April 8, 2013, Eberhard, who was taking photographs of police activity outside of the project area and along property owned by the North Coast Railroad Authority, was told by a CHP officer that if he did not leave the area he would be arrested. When Eberhard asked the CHP officer why he was being denied access to the area he was told that he had to get clearance from CALTRANS. When Eberhard followed-up with CALTRANS at the Willits office later that day, he was told it was CHP's call.

21. On April 8, 2013, in response to these and similar incidents, TWN Editor Linda Williams wrote to CALTRANS District 1 Director Charlie Fielder and CHP Captain Epperson complaining about the treatment of the press and in hopes of facilitating press access to the bypass project and surrounding areas to cover newsworthy events, including recording peace officers in the performance of their duties and documenting the construction of a controversial public project.

22. After receiving no response from Fielder or Epperson, Editor Williams contacted CALTRANS Assistant Deputy Director of Public Affairs Tamie McGowen. McGown agreed to intervene with CALTRANS District 1 by arranging for CALTRANS Public Affairs Officer Phil Frisbie to be on site for a week and to have a CALTRANS media representative facilitate access to the site thereafter.

23. On April 12, 2013, in a meeting with TWN Editor Williams, Publisher Clark and Eberhard, Frisbie offered to assign a media representative who could be contacted during normal business hours to escort TWN reporters and photographers while on the site. This arrangement for access during business hours was not exclusive and it was known that TWN did not agree to engage in newsgathering activities in the project area only in the presence of a CALTRANS escort or only during CALTRANS business hours.

24. Despite this arrangement recognizing that the purpose of the press's presence on the bypass project site was to gather information for dissemination to the public and not to interfere with, obstruct or injury the lawful business or occupation carried on by the property owner, CHP's harassment of the press, and Eberhard in particular, continued. For example,

○ On May 13, 2013, after receiving information that protest activities were underway on the south side of the Bypass Project, near gate 1 on the west side of Highway 101, Eberhard

8

COMPLAINT

1  contacted CALTRANS media representative, Matt McKeon, to escort him to the site. By the
2  time Eberhard and TWN Videographer Tony Ellis arrived at the scene with McKeon, one
3  individual already had been arrested and was in the back of a CHP vehicle and another had
4  locked himself to an excavator. When Eberhard approached the CHP vehicle to get a
5  photograph of the arrestee through the window of the vehicle, he immediately heard CHP
6  Officer Teddy M. Babcock rush up from behind, yelling at him, "Get away from there! Get
7  away from there!" Officer Babcock pointed at Eberhard to get away from the car. Eberhard
8  asked Babcock what the problem was and Babcock said he was standing in an unsafe area
9  and that he was responsible for his safety. Eberhard moved to the side of the car where
10  Babcock was pointing – on the far side of the car from the highway – but Babcock continued
11  yelling at him to go back to the area near the excavator where he could not see or photograph
12  the arrestee. Eberhard told Babcock that he was safe standing where he was and that he was
13  with a CALTRANS escort, but nevertheless proceeded back to the area directed.
14  • Later that same day, Ellis and Eberhard covered a protest that took place along county
15  owned Hearst Willits Road, where individuals carrying a long banner blocked a construction
16  vehicle. When Babcock moved in to arrest one of the individuals with the aid of another
17  CHP officer, Ellis videotaped the arrest activity, while Eberhard took photographs of it.
18  Both were standing on the side of the road, where the CHP vehicles were parked. At one
19  point, when Babcock was attempting to place the handcuffed protestor into the back of the
20  CHP vehicle with the aid of another officer, he turned to Ellis and, in an angry, aggressive
21  tone heard by Eberhard said, "You are going to go to jail in about a minute." Neither Ellis
22  nor Eberhard was interfering in any way with the arrest activity by recording and
23  photographing it; rather, they were doing their jobs.
24  • On May 20, 2013, Eberhard got word that two individuals had locked themselves to
25  equipment on the site. Eberhard called McKeon and left him a message asking to meet him.
26  Eberhard went to the site at about 7 a.m. and proceeded to photograph the protesters until a
27  CHP officer approached him and told him to leave. Eberhard informed the officer that he
28  was with TWN and that he was waiting for his CALTRANS escort. The officer came right

9

COMPLAINT

up to Eberhard's face telling him to leave now or he'd be arrested. Eberhard left the area.

Later, Eberhard learned that the two protesters were cited and released at the scene.

• On May 21, 2013, arrangements were made for Eberhard and Ellis to meet McKeon on Hearst Willits Road to be taken to the site to document the first pile driving at the bypass project. This event was highly newsworthy to the community as construction noise levels in the valley had been the subject of significant public debate. McKeon parked his truck about 200 feet from the pile driving rig and the three walked in wearing CALTRANS' hard hats and vests. Babcock was on the scene near the pile driving rigs and two other CHP officers were near the entrance of the site where 10-12 protesters were gathered on the shoulder of Hearst Willits Road. While Eberhard and Ellis were walking around before pile driving began, Babcock walked over to McKeon and talked to him. McKeon later told Eberhard and Ellis that Babcock voiced concern about the press being there and was asking whether CALTRANS had allowed it. According to McKeon, he informed Babcock that it was okay for the journalist to be there and that he was escorting them. McKeon continued to inform Eberhard and Ellis that during the pile driving operation they could roam at their own discretion, including inside of the roped perimeter placed about 150 feet from the pile driving rig, noting that once the pile (24" diameter by 110' long steel structure) had been driven into the ground a short distance it can't fall over and that this would be a safer time to get a close up view of the pile driving rig in operation. After the pile had been driven about one third of the way into the ground, Eberhard walked into the perimeter area to take some photographs. He was about 30 feet into the area when he heard Babcock yelling at him. He turned toward him and Babcock continued yelling at him telling him to leave the area. Eberhard told Babcock that he had McKeon's permission to enter the area. Eberhard photographed Babcock during this encounter and when Babcock noticed this he changed his gesture from a threatening, figure-pointing one to an open hand purporting to direct Eberhard to leave. Eberhard turned and walked back toward the perimeter rope. When he was about two feet from the rope, he turned to take two more photographs of the pile driving operation. Babcock instantly came running up and shoved Eberhard hard with two hands on Eberhard's

10

right shoulder. He then shoved him three more times on his shoulder while yelling at him before Eberhard turned toward him and told him to stop pushing him, explaining that he had a constitutional right to be there.

● Captain Epperson was informed of this incident by TWN Editor Williams. Epperson seemed unaware of the incident but agreed to investigate it. Epperson called several days later and acknowledged that the two state agencies were not working together as they should and apologized for the incident. Epperson told Williams that Caltrans and CHP were now on the same page. Nevertheless, the harassment and intimidation continued.

● On June 12, 2013, several dozen individuals staged a protest by lying down in the wick drain fields, chanting and holding signs. After CHP personnel arrived at the scene, the individuals got up but continued to sing, holding signs and a few individuals stood in front equipment trying to move within the area. Eberhard and Ellis were on the scene recording the protest activities for the paper. They were accompanied by their CALTRANS escort, McKeon. CHP Sergeant Braden Moffett, with Babcock standing along-side him, read a dispersal order to the crowd informing them that if they refused to leave the premises after having been read the order they would be arrested. After reading the dispersal order, Moffett immediately turned to Eberhard and Ellis standing apart from the protesters and clearly there to cover the protests as independent journalists, said, "And, we're going to take you two first."

● On June 22, 2013, Eberhard and Ellis went to the bypass project to cover protesters who had walked into the site area in an attempt to supply food to another protestor, Will Parrish, who had days earlier locked himself to one of the wick drain towers. After four individuals were arrested, the protesters began to leave. While Eberhard was walking off the site among other individuals exiting the area, CHP Sergeant Jeffrey A. Mesa pointed at Eberhard and ordered him to come back and approach him. Mesa asked Eberhard for his name and asked to look at his press pass. Eberhard attempted to show him the Mendocino County Sherriff's press pass but Mesa ignored it and reached for TWN press credentials also around Eberhard's neck and wrote down his name on his notepad. Mesa commented that he had seen Eberhard at these protests and then said in an intimidating manner, "You're pushing it." Eberhard

11

1  explained that he was just doing his job. Mesa stared directly at Eberhard for several
2  seconds without responding to his legitimacy before Eberhard turned and walked away. No
3  one else was pulled from the departing crowd and questioned in this manner. Mesa knew
4  that Eberhard was a member of the press from a previous encounter in March. On that
5  occasion, Mesa threatened to arrest Eberhard if after being read a dispersal order he refused
6  to lease the scene of a protest. Eberhard told Mesa he was a member of the press, and his
7  press credentials were fully visible to Mesa. Mesa nevertheless read him the dispersal order,
8  and Eberhard left the scene without incident.

9  • On July 1, 2013, after Parrish had occupied the wick drain tower for 11 days, Ellis got word
10  that CHP was moving in to extract Parrish from the tower and arrest him. Eberhard called
11  McKeon around 8:30 a.m. to arrange for an escort to the site. McKeon told Eberhard that
12  CHP Captain Epperson had informed McKeon that if he brought the press to the site to
13  document the extraction and arrest, CHP would shut down the operation. On that basis,
14  McKeon denied Eberhard's request for an escort. About 40 CHP personnel and a SWATT
15  team responded to the scene, taking about two hours to cut Parrish free and arrest him.

16  25.  At no time during the course of these events did Eberhard either intend to injure or
17  interfere with any lawful business or occupation carried on by the owner of the land or actually
18  injure or interfere with the owner's property rights. Nor did he ever participate in any protests, he
19  was there to cover them as a photojournalist. At all times relevant herein, CHP personnel and
20  CALTRANS personnel were aware that Eberhard was a credentialed member of the press and was
21  gathering information for dissemination to the public for TWN, and not as an individual intent on
22  interfering or impeding the bypass project or as a member of the protest contingent.

23  **D.  July 23, 2013 False Arrest of TWN Photojournalist Eberhard and Delay in Processing his Arrest.**
24

25  26.  On July 23, 2013, at about 6 a.m. a group of about 10-15 individuals walked through
26  the gate 6 entrance of the bypass project area carrying a large banner that read "Save our water Stop
27  Caltrans." The protesters walked about 100 yards into the area and while they were on the property
28  two other individuals entered the area and chained themselves to two wick drain drills. A CHP

12

1  officer read the group a dispersal order and thereafter instructed them that they would be arrested if
2  they refused to leave the property. After being read the dispersal order, the protesters slowly began
3  walking backwards toward the gate entrance still holding the banner. A CHP officer walked them
4  back towards the entrance, instructing them that if they stopped they would be arrested. No arrests
5  were made of these protesters, and they remained near gate 6 along the shoulder of Highway 101 for
6  several hours.

7      27.     At about 6:20 a.m., Eberhard drove past the protesters onto a wide area on the west
8  side of Highway 101 and parked. He immediately called McKeon for an escort but did not receive
9  an answer. He left a message asking him to meet him at the site, referred to as the north end wick
10 field. Eberhard put his two press passes around his neck and gathered his camera gear. He crossed
11 the highway at about 6:30 a.m., past the group that was gathered along the shoulder of the highway,
12 and walked through the open gate. Eberhard noticed one protester locked to a wick drain drill about
13 200 yards from the highway. He started walking toward the closest CHP officer he saw, with his
14 two cameras strapped around each shoulder and his press credentials hanging around his neck and
15 displayed on his chest. CHP Officer Dabbs saw Eberhard and walked towards him, meeting him
16 about half way between the highway and the area where a protester had locked himself onto a drill.

17     28.     The moment Eberhard was close enough to talk to Dabbs, he reached out to shake
18 hands with Dabbs and while shaking his hand, introduced himself saying "Good morning officer,
19 my name is Steve Eberhard of The Willits News." Eberhard then noticed the second protester and
20 asked Dabbs if he could come in a little closer to photograph the protesters locked to the towers.
21 Dabbs refused to allow him to photograph the protesters and told Eberhard that he would have to
22 leave. Eberhard then told Dabbs that he had called his CALTRANS escort McKeon to meet him at
23 the site, making clear to Dabbs that Eberhard's presence on the site was consensual and not intended
24 to interfere with or impede the lawful enjoyment of the owner's property rights. Nevertheless,
25 Dabbs told Eberhard that he was not allowed on the site without an escort. Eberhard explained that
26 he was trying to do his job and cover the protests and that he had a First Amendment right to do so.
27 Eberhard also made reference to his press credentials. Dabbs then told Eberhard he had to leave or
28 he was going to read him the dispersal order and arrest him if he thereafter refused to leave.

13

1  Eberhard told Dabbs, "Okay, go ahead and read me the dispersal order and I'll leave." Dabbs was
2  looking at his cell phone for the dispersal order when another CHP officer, Officer Kory Reynolds,
3  approached from the side, grabbing Eberhard's wrist and saying "You're going in. You're under
4  arrest." Eberhard told Reynolds that Dabbs was going to read him the dispersal order and that he
5  was going to leave, as had been the practice with protesters and on one prior occasion with Eberhard
6  himself, and that he did not want to be arrested. Reynolds said, "You know what that dispersal
7  order says. We're not going to read it." Dabbs then stopped looking for the dispersal order on this
8  phone and joined Reynolds in arresting Eberhard.

9      29.    Knowing that Eberhard would leave upon being read the dispersal order, and
10  knowing that Eberhard was there not to interfere with the owner's property rights in any manner but
11  to gather information for dissemination to the public about important matters of public interest,
12  Dabbs and Reynolds proceeded to arrest Eberhard, refusing to read him the dispersal order and
13  refusing to give him any opportunity to leave the property, even though Officer Dabbs said he would
14  and even though the protesters who were there to actually interfere with the construction of the
15  project were allowed to leave after having been read the dispersal order.

16      30.    Dabbs and Reynolds proceeded to seize Eberhard's two cameras, laying them on the
17  ground. They then pulled his other arm behind his back and placed handcuffs on his wrists. A
18  CALTRANS employee drove up and stopped about 15 feet from the officers. Eberhard asked if she
19  would take his cameras to McKeon for safekeeping, but she refused. Reynolds told Eberhard that
20  they were confiscating his cameras as evidence.

21      31.    Eberhard reiterated that he did not want to be arrested and that he was just trying to
22  do his job. Reynolds told Eberhard he was being arrested for trespassing and that they were taking
23  him in. Reynolds walked Eberhard to the patrol car holding his arm and leaned him up against the
24  patrol car, face forward. Reynolds and Dabbs proceeded to conduct a pat down search of
25  Eberhard's person, removing his cell phone, with source contact information, and journalist's
26  notepad and pen, among other things. Eberhard was then placed in the back of the patrol car, with
27  his wrists still cuffed behind him.

28

14

32. After about 10 minutes in the back of the patrol car, Dabbs opened the driver-side door to get a note pad. Eberhard told Dabbs that he had a bad shoulder and it was hurting in this position. Dabbs told Eberhard, "You should have thought of that before you walked out here." He then closed the door. After about another 15 minutes, Sergeant Lott opened the door and asked Eberhard how he was doing. Eberhard, said, "Sgt. Lott, it's a mistake to arrest the press for trying to document the story." Eberhard told him he should let him go. Eberhard then told Lott that he had four surgeries on his shoulder and that it was hurting him bad in this position. Lott did not respond to this. The two proceeded to have a conversation where Eberhard conveyed that he had always shown respect to him and the other CHP officers and that there was only one time that he called out Babcock for shoving him repeatedly on May 21, 2013, when he was with his escort. Lott smiled and said he had heard about those prior incidents. He then closed the door and walked back to a group of officers.

33. About five minutes later, Reynolds and Dabbs walked over and opened the door for Eberhard to get out. They adjusted the handcuffs to allow more separation between the wrists and placed him back into the patrol car.

34. About an hour transpired from the time of the arrest until Dabbs opened the door and strapped Eberhard's seatbelt in for the trip to Mendocino County Jail, about 30 minutes away. As Dabbs drove from the site, the protesters were still present along the shoulder of Highway 101, some chanting "freedom of the press" and words to that effect. At no time was Eberhard read his Miranda rights.

35. When they arrived at the jail, a sheriff's deputy came out to greet arresting officer Dabbs. Dabbs, who knew Eberhard was a journalist, told the deputy that he had "another protester in the back." Eberhard said, "I am not a protester, I am the press." The deputy did not respond. Dabbs proceeded to hold Eberhard in the back of the car, questioning him and filling out paper work for about another 30 minutes.

36. Dabbs brought Eberhard into the jail's intake room, where the handcuffs were removed from his wrists. He was then placed in a cell and held there for about two hours. Then he was taken to another room where he was fingerprinted and his mug shot was taken. He was issued a

15

1  "pre-trial release" form, requiring that he appear in Mendocino County Superior Court in Ukiah on

2  August 23, 2013. His cell phone, notepad and personal effects were returned to him. He was

3  released about 12 p.m.

4       37.    Upon release, he went to the Ukiah Office of CHP to retrieve his cameras, which

5  purportedly were being held as evidence.

6       38.    On or about August 19, Mendocino County District Attorney C. David Easter

7  informed Eberhard, through counsel, that no charges would be filed against him.

8       39.    The two protesters who chained themselves to the wick drain on the construction site

9  that morning, causing construction delays, interfering with the property owner's property rights and

10  necessitating the law enforcement response, were cited by CHP and released at the scene.

11  **E.   CHP's Falsification of the Arrest Report and CHP's and CALTRANS' Post-Arrest**
   **Collusion in Falsely Portraying Photojournalist Eberhard as a Protester to Destroy his**
12  **Credibility as a Neutral Fact Gatherer, to Chill his First Amendment Rights and to**
   **Retaliate against him for Exercising those Rights.**
13

14       40.    Despite knowing the true facts, Dabbs prepared an undated narrative to the arrest

15  report full of numerous falsehoods, including but not limited to the statement that Reynolds told

16  Eberhard to leave the premises before grabbing his wrist, placing it behind his back and arresting

17  him; that Eberhard violated the trespass laws as outlined in subdivision (k) of Penal Code Section

18  602, or any other subdivision therein; that Eberhard refused to leave or that he was arrested after

19  refusing to leave; and, that Eberhard was not questioned after the arrest. Additional false

20  representations about the supposed protocol for obtaining access to the site were included in the

21  report. The arrest report's first page also indicates that Dabbs attempts to justify Eberhard's

22  misdemeanor incarceration, rather than immediate release, by claiming he "would be reasonably

23  likely to continue the offense or offenses, or the safety of persons or property would be imminently

24  endangered if immediately released." Given that is was known to CHP, including officers Dabbs

25  and Reynolds and Captain Epperson, that Eberhard had entered the property not to participate in the

26  protests or in any way impede the bypass project but to gather information for dissemination to the

27  public, including the recording of peace officers in the performance of their duties, these statements

28  were knowingly false.

16

41. Not surprisingly, Eberhard's arrest and incarceration were met with universal rebuke by the journalism community throughout California. Numerous editorials were published condemning the actions of CHP in arresting Eberhard for doing his job and attempting to photograph newsworthy events.

42. In response to these editorials, CHP Chief Bridget Lott and Caltrans District 1 Director Charlie Fielder jointly penned a "letter to the editor" stating, among other things, that Eberhard was arrested because he "trespassed" and "refused a lawful order to exit." The letter further stated that Eberhard "was led peacefully from the construction site not because of his profession, but because he refused lawful orders to leave a construction site." The letter also said, "We strongly object to a claim that members of the press corps have been treated with anything but respect and professional courtesy."

43. Soon after the letter was presented to TWN and a sister paper in Chico, CALTRANS Director of Communications Fran Clader was informed that the characterization about Eberhard's arrest was inaccurate and potentially defamatory of him. She was also informed that the statement that CHP and CALTRANS have treated the press with nothing but respect and professional courtesy was grossly inaccurate. Despite being informed about the inaccuracies of these statements, Lott and Fielder caused the letter, as originally penned, to be published in numerous newspapers in California. However, Lott and Fielder did agree to change the letter before it was published in TWN, and its sister papers. Instead, of stating that Eberhard failed to obey a lawful order, Lott and Fielder, through Clader, agreed to change the letter to say that Eberhard was directed by an officer to leave and that he was arrested not because of his profession but because he refused to leave a construction site. The letter with this changed language was then published in TWN and its sister papers, not because it was true but because it mirrored the official version of events in the arrest report and thus was protected from false publication of facts under the fair and true report privilege.

44. On August 2, 2013, in response to a letter written to CHP Commissioner Joseph A. Farrow by the Society of Environmental Journalists in protest of CHP's treatment of Eberhard, Lott wrote to the Society of Environmental Journalists. In this letter to Eberhard's professional, journalism peers, Lott falsely portrayed Eberhard as a protester not only on prior occasions in which

17

1 he was covering the protests as a journalist but on the date of his arrest. Specifically, she states, in

2 relevant part:

3   [H]e had visited the site many times since early February 2013, and had been granted access
    without incident. In other situations he was on site as part of a protest contingent, but had
4   left voluntarily with the protesters when asked. ¶ Gaining access to the issues that make up
    the news is at the heart of the journalistic enterprise and the CHP takes seriously its role in
5   facilitating that process. The CHP does not want to see any member of the media arrested.
    Unfortunately, on this particular day, Mr. Eberhard declined to conform to the well-defined
6   set of operating standards. It was explained to him, no less than three times, that he was
    putting himself in a situation which could lead to arrest. Though originally acting as part of
7   a group of protesters, when all other protesters had left the site as requested, Mr. Eberhard
    remained.¶ He was given additional time to leave but chose not to, leaving officers with no
8   other course of direction but to take him into custody for trespassing; for his safety, the
    safety of the workers, and the operational necessity of the project.
9

10   45.    These statements were false and known to be false when stated but nevertheless were

11 published for the purpose of further intimidating and chilling the exercise of Eberhard's state and

12 federal constitutional speech rights and in further retaliation for his legitimate newsgathering

13 activities, including photographing peace officers in the performance of their duties on numerous

14 prior occasions.

15                              **FIRST CAUSE OF ACTION**

16   **SECTION 1983 CLAIM FOR VIOLATING EBERHARD'S FIRST AND FOURTEENTH
                          AMENDMENT RIGHTS**

17   **(Claim for Damages Against Defendants Dabbs and Reynolds, and Does 1-25 in Their
    Individual Capacities; and for Equitable Relief Against Defendants Dabbs and Reynolds in
18                            their Official Capacities)**

19   46.    Eberhard repeats and realleges the allegations in Paragraphs 1 through 45 as if fully

20 set forth herein.

21   47.    Observing and recording police activity on public property and in public spaces, and

22 the right to record matters of public interest is fully protected by the free speech and free press

23 clauses of the First Amendment to the United States Constitution, as applied to the State of

24 California through the Fourteenth Amendment.

25   48.    Likewise, a citizen's right to exercise First Amendment freedoms without facing

26 retaliation from the government for the exercise of those freedoms is clearly established.

27   49.    Dabbs' and Reynolds' conduct of arresting Eberhard, seizing his newsgathering

28 materials, delaying the processing of his arrest (partially through false representations to the county

                                      18

COMPLAINT

jailer that he was just another protester) and falsifying the arrest report to make it appear as though Eberhard refused to leave the property, violated trespass laws, and, if immediately released, would be a continuing threat to the property owner's enjoyment of its property rights, violated Eberhard's clearly established First Amendment rights and rights under the laws of the United States. That protestors who were there to impede, obstruct and delay the bypass project were read a dispersal order and allowed to leave, and that two protesters who actually impeded the project by chaining themselves to equipment were cited and released by CHP personnel that same morning further shows that Dabbs and Reynolds intentionally singled out Eberhard for arrest in violation of and in retaliation for his exercise of First Amendment rights.

50.    Dabbs' and Reynolds' actions were undertaken to deter and chill the exercise of Eberhard's First Amendment rights on July 23, 2013, and in the future; and, to retaliate against Eberhard for recording police activities on public property and for recording matters of public interest pertaining to the bypass project on prior occasions.

51.    Dabbs' and Reynolds' conduct actually chilled the exercise of Eberhard's First Amendment rights as he was temporarily taken off of the bypass project by TWN, and he fears further harassment, obstruction and detention by CHP officers, which prevents him from doing his job effectively. Moreover, Dabb's and Reynolds' conduct would chill persons of ordinary firmness from continuing to engage in their constitutionally protected activities.

52.    Dabbs' and Reynolds' actions were flagrant, malicious, willful and oppressive, and engaged in with callous indifference and in conscious disregard of Eberhard's federally protected rights.

53.    As a direct and proximate result of Dabbs' and Reynolds' conduct, Eberhard suffered damages, including to his personal and professional reputations, loss earning capacity, physical pain and suffering, psychological and emotional injury, past and future, degradation, humiliation, mental anguish, suffering and embarrassment, and loss of the ability to convey time sensitive, newsworthy information to the paper for publication.

1

## SECOND CAUSE OF ACTION

2

### SECTION 1983 CLAIM FOR VIOLATING EBERHARD'S FIRST AND FOURTEENTH AMENDMENT RIGHTS

3

4

**(Claim for Damages Against Defendant Babcock in his Individual Capacity, and Claim for Equitable Relief Against Defendant Babcock in his Official Capacity)**

5      54.      Eberhard repeats and realleges the allegations in Paragraphs 1 through 53 as if fully

6    set forth herein.

7      55.      Observing and recording police activity on public property and in public spaces, and

8    the right to record matters of public interest is fully protected by the free speech and free press

9    clauses of the First Amendment to the United States Constitution, as applied to the State of

10    California through the Fourteenth Amendment.

11      56.      Likewise, a citizen's right to exercise First Amendment freedoms without facing

12    retaliation from the government for the exercise of those freedoms is clearly established.

13      57.      Babcock's conduct of harassing and intimidating Eberhard, preventing him from

14    photographing an arrestee, threatening to arrest him, limiting his access to public property while

15    accompanied by a CALTRANS' escort, and committing an assault and battery on his person

16    violated his clearly established First Amendment rights.

17      58.      Babcock's actions were undertaken to deter and chill the exercise of Eberhard's First

18    Amendment rights; and, to retaliate against Eberhard for recording police activities on public

19    property and for recording matters of public interest pertaining to the bypass project on prior

20    occasions, including recording Babcock in the performance of his duties as a CHP officer.

21      59.      Babcock's conduct actually chilled the exercise of Eberhard's First Amendment

22    rights by preventing him from photographing certain events and from certain vantage points on May

23    13, 2013, and May 21, 2013, and he fears further harassment and obstruction by Babcock, who

24    regularly patrols the bypass project area, all of which prevent Eberhard from doing his job

25    effectively. Moreover, Babcock's conduct would chill persons of ordinary firmness from continuing

26    to engage in their constitutionally protected activities.

27      60.      Babcock's actions were flagrant, malicious, willful and oppressive, and engaged in

28    with callous indifference and in conscious disregard of Eberhard's federally protected rights.

20

COMPLAINT

1    61.    As a direct and proximate result of Babcock's conduct, Eberhard suffered damages,

2 including to his personal and professional reputations, loss of earning capacity, physical pain and

3 suffering, psychological and emotional injury, past and future, degradation, humiliation, mental

4 anguish, suffering and embarrassment, and loss of the ability to convey time sensitive, newsworthy

5 information to the paper for publication.

6                       **THIRD CAUSE OF ACTION**

7 **SECTION 1983 CLAIM FOR VIOLATING EBERHARD'S FOURTH AND FOURTEENTH AMENDMENT RIGHTS**

8 **(Claim for Damages Against Defendants Dabbs and Reynolds and Does 1-25 in their Individual Capacities; Claim for Equitable Relief Against Defendants Dabbs and Reynolds**
9 **and Does 1-25 in their Official Capacity)**

10    62.    Eberhard repeats and realleges the allegations in Paragraphs 1 through 61 as if fully

11 set forth herein.

12    63.    Under the Fourth Amendment to the United States Constitution, as applied to the

13 State of California through the Fourteenth Amendment, Eberhard has a right to be free from

14 unreasonable searches and seizures.

15    64.    Dabbs and Reynolds intended to and did violated Eberhard's clearly established

16 Fourth Amendment rights to be free from unreasonable searches and seizures by arresting Eberhard,

17 searching his person, seizing his newsgathering materials, and causing him to be held in custody,

18 without a warrant or probable cause to believe Eberhard had engaged in any criminal activity.

19    65.    Because Dabbs and Reynolds knew that Eberhard was a photojournalist there to

20 cover the protests and not part of any protest contingent, and because he was never ordered to leave,

21 never refused to leave and indeed told both officers that he would leave, and because at all times

22 Dabbs and Reynolds knew, or reasonably should have known, that Eberhard did not intend to injure,

23 interfere with or obstruct the lawful business or occupation carried on by the property owner, the

24 conduct of Dabbs and Reynolds in arresting Eberhard, searching his person and confiscating his

25 newsgathering materials, including his cameras, was unreasonable and in violation of Eberhard's

26 clearly established constitutional rights to be free from unreasonable searches and seizures. That

27 protestors who were there to impede, obstruct and delay the bypass project were read a dispersal

28 order and allowed to leave, and that two protesters who actually impeded the project by chaining

21

themselves to equipment were cited and released by CHP personnel that same morning further shows that Dabbs and Reynolds intentionally singled out Eberhard for arrest in violation of his Fourth Amendment rights.

66. Dabbs' and Reynolds' actions were flagrant, malicious, willful and oppressive, and engaged in with callous indifference and in conscious disregard of Eberhard's federally protected rights.

67. As a direct and proximate result of Dabbs' and Reynolds' conduct, Eberhard suffered damages, including to his personal and professional reputations, loss of earning capacity, physical pain and suffering, psychological and emotional injury, past and future, degradation, humiliation, mental anguish, suffering and embarrassment, and loss of the ability to convey time sensitive, newsworthy information to the paper for publication.

## FOURTH CAUSE OF ACTION

### SECTION 1983 CLAIM FOR VIOLATING EBERHARD'S FIRST, FOURTH AND FOURTEENTH AMENDMENT RIGHTS

**(Claim for Damages Against Defendant Epperson and Does 1-25 in their Individual Capacities; Claim for Equitable Relief Against Defendant Epperson and Does 1-25 in their Official Capacity)**

68. Eberhard repeats and realleges the allegations in Paragraphs 1 through 67 as if fully set forth herein.

69. Observing and recording police activity on public property and in public spaces, and the right to record matters of public interest is a clearly established right fully protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the State of California through the Fourteenth Amendment.

70. Likewise, a citizen's right to exercise First Amendment freedoms without facing retaliation from the government for the exercise of those freedoms is clearly established.

71. The right to be free from unreasonable searches and seizures as guaranteed under the Fourth Amendment of the United States Constitution, as applied to the State of California under the Fourteenth Amendment, also is a clearly established right.

72. At all times relevant herein, Epperson knew of the harassment and intimidation that was being carried out by his subordinates against the press, and Eberhard in particular, for recording

COMPLAINT

1  peace officers in the performance of their duties on public property and in public spaces and for
2  gathering information about important events of public interest pertaining to the bypass project, and
3  knew or reasonably should have known that these actions were depriving the press, and Eberhard in
4  particular, of clearly established rights under the First, Fourth and Fourteenth Amendments, or
5  would lead to the deprivation of these constitutionally protected rights by his subordinates.

6      73.    Epperson failed to act to prevent his subordinates from engaging in such conduct,
7  including by failing to train, supervise and adequately control his subordinates; and, indeed it is
8  believed that he ratified, condoned, acquiesced, authorized and/or directed officers under his charge
9  to threaten arrest and to arrest any member of the press in the area of the bypass project if not in the
10 company of a CALTRANS escort though there would be no reasonable basis to conclude that
11 members of the press, including Eberhard, would be interfering with or obstructing the lawful
12 business or occupation carried on by the owner of the property by recording peace officers in the
13 performance of their duties or gathering information for dissemination to the public about the bypass
14 project and protest activities in the project area and elsewhere on public property.

15     74.    Epperson's actions were flagrant, malicious, willful and oppressive, and engaged in
16 with callous indifference and in conscious disregard of Eberhard's federally protected rights.

17     75.    As a direct and proximate result of Epperson's actions, or failure to act, Eberhard
18 suffered damages, including to his personal and professional reputations, loss of earning capacity,
19 physical pain and suffering, psychological and emotional injury, past and future, degradation,
20 humiliation, mental anguish, suffering and embarrassment, and loss of the ability to convey time
21 sensitive, newsworthy information to the paper for publication.

22                          **FIFTH CAUSE OF ACTION**
23  **SECTION 1983 CLAIM FOR VIOLATING EBERHARD'S FIRST AND FOURTEENTH
                          AMENDMENT RIGHTS**
24      (Claim for Damages Against Defendant Lott, Fielder and Does 1-25
                          in their Individual Capacities)
25
26     76.    Eberhard repeats and realleges the allegations in Paragraphs 1 through 75 as if fully
   set forth herein.
27
28
                                    23
   COMPLAINT

77. Observing and recording police activity on public property and in public spaces, and the right to record matters of public interest is a clearly established right fully protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the State of California under the Fourteenth Amendment.

78. Likewise, a citizen's right to exercise First Amendment freedoms without facing retaliation from the government for the exercise of those freedoms is clearly established.

79. After Eberhard's arrest and after significant outcry in the press and journalistic communities over Eberhard's arrest, CHP Chief Lott and CALTRANS District 1 Director Fielder conspired to destroy Eberhard's credibility as a neutral fact gatherer by falsely portraying his actions on the day of the arrest and on earlier occasions. Those false representations included statements that Eberhard was arrested after failing to obey a lawful order to exit, and that he was led peacefully from the construction site not because of his profession but because he refused lawful orders to leave a construction site. Lott further acted to destroy Eberhard's reputation in his own journalistic community when she wrote a letter to the Society of Environmental Journalists falsely portraying Eberhard as a protester on prior occasions in which he was covering the protests as a journalists and also on the date of his arrest.

80. Lott's and Fielder's actions were undertaken for the purpose of intimidating and chilling the exercise of Eberhard's First Amendment rights by destroying his credibility as a neutral fact gather by portraying him as a protester or biased agitator, and in further retaliation for his legitimate newsgathering activities, including photographing peace officers in the performance of their duties on numerous prior occasions, and this purpose was a substantial or motivating factor in their actions.

81. Lott's and Fielder's conduct actually chilled the exercise of Eberhard's First Amendment rights as he was temporary taken off of the bypass project by TWN, and it damaged his credibility as a neutral fact gather, which prevents him from doing his job effectively. Moreover, Lott's and Fielder's conduct would chill persons of ordinary firmness from continuing to engage in their constitutionally protected activities.

COMPLAINT

82.     Lott's and Fielder's actions were flagrant, malicious, willful and oppressive, and engaged in with callous indifference and in conscious disregard of Eberhard's federally protected rights.

83.     As a direct and proximate result of Lott's and Fielder's conduct, Eberhard suffered damages, including to his personal and professional reputations, loss of earning capacity, psychological and emotional injury, past and future, degradation, humiliation, mental anguish, suffering and embarrassment, and loss of the ability to convey time sensitive, newsworthy information to the paper for publication.

### SIXTH CAUSE OF ACTION
### 42 U.S.C. § 2000aa -- PRIVACY PROTECTION ACT OF 1980
### (Against Dabbs, Reynolds and Epperson in their Individual Capacities)

84.     Eberhard repeats and realleges the allegations in Paragraph 1 through 83 as if fully set forth herein.

85.     The seizure of Eberhard's cameras, journalist notepad and cell phone, with source contact information, constituted a search and seizure of work product and documentary materials from Eberhard, who Dabbs and Reynolds knew was a credentialed photojournalist for TWN.

86.     Dabbs' and Reynolds' seizure of Eberhard's cameras and newsgathering tools without issuance of a subpoena and without probable cause to believe that Eberhard had committed any criminal offense to which the materials related, violated the Privacy and Protection Act of 1980, 42 U.S.C. Section 2000aa.

87.     Epperson knew of the harassment and intimidation that was being carried out by his subordinates against the press, and Eberhard in particular, for recording peace officers in the performance of their duties on public property and in public spaces and for gathering information about important events of public interest pertaining to the bypass project, and knew or reasonably should have known that these actions were depriving the press, and Eberhard in particular, of clearly established rights under the First, Fourth and Fourteenth Amendments, or would lead to the deprivation of these constitutionally protected rights by his subordinates.

88.     Epperson failed to act to prevent his subordinates from engaging in such conduct, including by failing to train, supervise and adequately control his subordinates; and, indeed it is

25

1 believed that he ratified, condoned, acquiesced, authorized and/or directed officers under his charge

2 to threaten arrest and to arrest any member of the press in the area of the bypass project if not in the

3 company of a CALTRANS escort though there would be no reasonable basis to conclude that

4 members of the press, including Eberhard, would be interfering with or obstructing the lawful

5 business or occupation carried on by the owner of the property by recording peace officers in the

6 performance of their duties or gathering information for dissemination to the public about the bypass

7 project and protest activities in the project area and elsewhere on public property.

8      89.     Dabbs', Reynolds' and Epperson's actions were flagrant, malicious, willful and

9 oppressive, and engaged in with callous indifference and in conscious disregard of Eberhard's

10 federally protected rights.

11      90.     As a result of Dabbs', Reynolds' and Epperson's action, or inactions, Eberhard

12 suffered actual damages, including the inability to utilize his cameras and newsgathering materials

13 to obtain and convey vital information for dissemination to the public in a timely manner.

14 **SEVENTH CAUSE OF ACTION**

15 **FALSE ARREST AND FALSE IMPRISONMENT**

**(Claim for Damages and Equitable Relief Against Defendants Dabbs, Reynolds, Epperson,**
16 **CHP, CALTRANS and Does 1-25)**

17      91.     Eberhard repeats and realleges the allegations in Paragraphs 1 through 90 as if fully

18 set forth herein.

19      92.     On July 23, 2013, Officers Dabbs and Reynolds had no rational reason to believe

20 Eberhard was violating any law, including trespass, which under California law requires a specific

21 intent to interfere with or impede the property owner's enjoyment of his or her property rights and

22 which includes an express exception for constitutionally protected conduct, and at all relevant times

23 Dabbs and Reynolds knew or reasonably should have known that Eberhard was on the bypass

24 project site to document newsworthy events for TWN. Dabbs and Reynolds also knew or

25 reasonably should have known that Eberhard's entry onto the site of the bypass project was not

26 nonconsensual or in violation of the property owner's rights as he had been on the site on other

27 occasions, both with and without a Caltrans escort, without incident.

28

1    93.    Nevertheless, Dabbs and Reynolds, acting in the scope and course of their
2  employment by CHP, arrested Eberhard without a warrant, without probable cause to believe he
3  violated any law and without any other legal justification.

4    94.    Dabbs and Reynolds intended to confine Eberhard and deprive him of his liberty
5  when they arrested him, placed him in the patrol car and transported him to county jail, where he
6  was incarcerated for several hours and then booked and released.

7    95.    At all times relevant herein, Epperson knew of the harassment and intimidation that
8  was being carried out by his subordinates against the press, and Eberhard in particular, for recording
9  peace officers in the performance of their duties on public property and in public spaces and for
10  gathering information about important events of public interest pertaining to the bypass project, and
11  knew or reasonably should have known that these actions would lead to Eberhard's unlawful arrest
12  and confinement in violation of his state and federal constitutional rights.

13    96.    Epperson failed to act to prevent his subordinates from engaging in such conduct,
14  including by failing to train, supervise and adequately control his subordinates; and, indeed it is
15  believed that he ratified, condoned, acquiesced, authorized and/or directed officers under his charge
16  to threaten arrest and to arrest any member of the press in the area of the bypass project if not in the
17  company of a CALTRANS escort though there would be no reasonable basis to conclude that
18  members of the press, including Eberhard, would be interfering with or obstructing the lawful
19  business or occupation carried on by the owner of the property by recording peace officers in the
20  performance of their duties or gathering information for dissemination to the public about the bypass
21  project and protest activities in the project area, or elsewhere.

22    97.    Dabbs' and Reynolds' and Epperson's actions were flagrant, malicious, willful and
23  oppressive, and engaged in with callous indifference and in conscious disregard of Eberhard's
24  rights.

25    98.    These actions caused actual harm to Eberhard, including physical pain and suffering,
26  emotional injury, degradation, humiliation, mental anguish, embarrassment, reputational harm, and
27  loss of earning capacity, and loss of the ability to convey time sensitive, newsworthy information to
28  the paper for publication.

COMPLAINT

1        99.    Dabbs', Reynolds' and Epperson's conduct was a substantial factor in causing

2 Eberhard's harm.

3 **EIGHTH CAUSE OF ACTION**

4 **BANE ACT VIOLATIONS, Cal. Civ. Code Section 52.1**

**(Claim for Damages and Equitable Relief Against Defendants Babcock, CHP and Does 1-25)**

5

6       100.    Eberhard repeats and realleges the allegations in Paragraphs 1 through 99 as if fully

7 set forth herein.

8       101.    Babcock interfered with Eberhard's state and federal constitutional rights to gather

9 news for dissemination to the public about important matters of public interest and to photograph

10 peace officers in the performance of their duties by threatening to arrest him and by committing

11 assault and battery upon his person.

12       102.    These acts of intimidation, violence and coercion were done by Babcock in

13 retaliation of Eberhard's exercise of these state and federal constitutional rights (First Amendment,

14 Fourteenth Amendment; Cal. Const. Art. 1, § 2).

15       103.    At all times relevant herein, Epperson knew of the harassment and intimidation that

16 was being carried out by his subordinates, including Babcock, against the press, and Eberhard in

17 particular, for recording peace officers in the performance of their duties on public property and in

18 public spaces and for gathering information about important events of public interest pertaining to

19 the bypass project, and knew or reasonably should have known that these actions were depriving the

20 press, and Eberhard in particular, of clearly established rights under the First and Fourteenth

21 Amendments of the United States Constitution and Article 1, Section 2 (a) of the California

22 Constitution, or would lead to the deprivation of these constitutionally protected rights by his

23 subordinates.

24       104.    Epperson failed to act to prevent his subordinates from engaging in such conduct,

25 including by failing to train, supervise and adequately control his subordinates; and, indeed it is

26 believed that he ratified, condoned, acquiesced, authorized and/or directed officers under his charge

27 to engage in conduct that he knew, or reasonably should have known, would lead to the deprivation

28 of constitutionally protected rights.

28

COMPLAINT

1    105.    These actions caused actual harm to Eberhard, including physical pain and suffering,

2  emotional injury, degradation, humiliation and mental anguish.[1]

3    106.    Babcock's and Epperson's conduct was a substantial factor in causing Eberhard's

4  harm.

5                                **NINTH CAUSE OF ACTION**

6                    **BANE ACT VIOLATIONS, Cal. Civ. Code Section 52.1**

7  **(Claim for Damages and Equitable Relief Against Defendants Dabbs, Reynolds, Epperson, CHP and Does 1-25)**

8    107.    Eberhard repeats and realleges the allegations in Paragraphs 1 through 106 as if fully

9  set forth herein.

10    108.    Dabbs and Reynolds interfered with Eberhard's state and federal constitutional rights

11 to gather news for dissemination to the public about important matters of public interest, to

12 photograph peace officers in the performance of their duties and to enjoy equal protection of the

13 laws (First Amendment, Fourteenth Amendment; Cal. Const. Art. 1, §§ 2, 7) by arresting Eberhard

14 without probable cause and without an arrest warrant and by intentionally delaying the processing of

15 his arrest while knowing he was in physical pain from the wrist restraints.

16    109.    Dabbs and Reynolds further interfered with state and federal laws (42 U.S.C. §

17 2000aa; Cal. Pen. Code §1524) designed to protect journalists, such as Eberhard, against seizures of

18 newsgathering materials, even with a warrant, where no rational reason exists to suspect the

19 materials seized will contain evidence of a crime committed by the journalist. Dabbs and Reynolds

20 interfered with these rights and laws by seizing Eberhard's cameras, journalist's notepad and cell

21 phone during the commission of an unlawful arrest without probable cause, and by holding these

22 materials purportedly as evidence without any rational basis to believe these materials would contain

23 any evidence since no crime was committed by Eberhard and no reasonable peace office in Dabbs

24 and Reynolds position would believe any such crime was committed by Eberhard when he entered

25 the site to photograph the protesters, a purpose known by and conveyed to the officers.

26

27 ──────────────

[1] The primary relief sought against Babcock under this claim is a declaration that Babcock's conduct
28 of intimidation and harassment violates Eberhard's state and federal constitutional rights and an
injunction prohibiting such conduct in the future.

COMPLAINT

110. These acts of intimidation and coercion were done in violation of these state and federal laws and in retaliation of Eberhard's exercise of his state and federal constitutional rights to gather news, to photograph peace officers in the performance of their duties and to enjoy equal protection of the laws.

111. At all times relevant herein, Epperson knew of the harassment and intimidation that was being carried out by his subordinates against the press, and Eberhard in particular, for recording peace officers in the performance of their duties on public property and in public spaces and for gathering information about important events of public interest pertaining to the bypass project, and knew or reasonably should have known that these actions were depriving the press, and Eberhard in particular, of clearly established statutory and constitutional rights, or would lead to the deprivation of these statutory and constitutionally protected rights by his subordinates.

112. Epperson failed to act to prevent his subordinates from engaging in such conduct, including by failing to train, supervise and adequately control his subordinates; and, indeed it is believed that he ratified, condoned, acquiesced, authorized and/or directed officers under his charge to engage in conduct that he knew, or reasonably should have known, would lead to the deprivation of constitutionally protected rights.

113. Dabbs', Reynolds' and Epperson's actions were flagrant, malicious, willful and oppressive, and engaged in with callous indifference and in conscious disregard of Eberhard's rights.

114. The above acts committed by Dabbs, Reynolds and Epperson caused actual harm to Eberhard, including physical pain and suffering, emotional injury, degradation, humiliation, mental anguish, embarrassment, reputational harm, and loss of earning capacity, and loss of the ability to convey time sensitive, newsworthy information to the paper for publication .

115. Dabbs,' Reynolds' and Epperson's conduct was a substantial factor in causing Eberhard's harm.

30

COMPLAINT

1

## TENTH CAUSE OF ACTION

2

### UNNECESSARY DELAY IN PROCESSING ARREST AND IN RELEASING PHOTOJOURNALIST EBERHARD

3

**(Claim for Damages Against Defendants Dabbs, Reynolds, CHP and Does 1-25)**

4      116.    Eberhard repeats and realleges the allegations in Paragraphs 1 through 115 as if fully

5   set forth herein.

6      117.    Dabbs and Reynolds caused Eberhard to be held in custody, from the time of his

7   arrest until the time of his release, for nearly six hours. This time was far in excess of the time

8   necessary to complete booking paperwork or to process Eberhard's arrest. Indeed, the initial delay

9   in transporting Eberhard to county jail was not only unnecessary, it was an intentional effort by

10  Dabbs and Reynolds to harass, intimidate and retaliate against Eberhard for attempt to cover the

11  protest on that day and for his prior newsgathering activities related to the bypass project.

12     118.    Eberhard was further held in a county jail cell for two hours before he was

13  fingerprinted and booked, in part, because of Dabbs' false representation to sheriff personnel that

14  Eberhard was a protester. This delay in releasing Eberhard was unnecessary and intentional.

15     119.    Eberhard did not consent to this delay.

16     120.    Dabbs' and Reynolds' actions were flagrant, malicious, willful and oppressive, and

17  engaged in with callous indifference and in conscious disregard of Eberhard's federally protected

18  rights.

19     121.    In addition to nominal damages, Eberhard was actually harmed by the delay in

20  processing his release, including but not limited to physical pain and suffering, emotional injury,

21  degradation, humiliation, mental anguish, embarrassment, reputational harm, and loss of the ability

22  to convey time sensitive, newsworthy information to the paper for publication.

23     122.    Dabbs and Reynolds conduct was a substantial factor in causing Eberhard's harm.

24

### ELEVENTH CAUSE OF ACTION

25

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

26

**(Claim for Damages Against Defendants Dabbs, Reynolds, Epperson, Lott, Fielder, CHP and Does 1-25)**

27     123.    Eberhard repeats and realleges the allegations in Paragraphs 1 through 122 as if fully

28  set forth herein.

31

COMPLAINT

124. The conduct of Dabbs, Reynolds, Epperson, Lott and Fielder, in arresting Eberhard, seizing newsgathering materials, delaying the processing of his arrest and then falsely portraying the facts in the press and with Eberhard's peers in order to chill his First Amendment and state constitutional rights by destroying his credibility as a journalist, as more fully set forth above, was outrageous and intended to cause emotional distress to Eberhard.

125. Eberhard suffered emotional distress.

126. The conduct of these CHP and CALTRANS officers and personnel was a substantial factor in causing Eberhard's server emotional defense.

## TWELTH CAUSE OF ACTION
### DECLARATORY RELIEF/CIV. PROC. CODE SECTION 1060
### (Against All Defendants and Does 1-25)

127. Eberhard repeats and realleges the allegations in Paragraphs 1 through 126 as if fully set forth herein.

128. An actual controversy has existed and now exist between Eberhard and Defendants concerning their respective rights and duties. Eberhard contends that he cannot be arrested for trespass under California law for gathering information for dissemination to the public, recording peace officers in the performance of their duties and recording matters of public interest in the bypass project footprint. Defendants contend that Eberhard is committing the crime of trespass (Cal. Penal. Code 602) whenever he enters the bypass project footprint unaccompanied by a CALTRANS monitor. Eberhard further contends that retaliating against him for recording matters of public interest, including recording peace officers in the performance of their duties in the bypass project footprint and elsewhere on public property, violates his clearly established rights under the First and Fourteenth Amendments to the United States Constitution and Article 1, Section 2(a) of the California Constitution, but Defendants dispute that.

129. Eberhard seeks a judicial declaration of the parties' rights and duties. A declaration is necessary and appropriate at this time as the bypass project is an ongoing, long-term project of substantial interest to the public and the violations alleged herein are ongoing.

32

COMPLAINT

1                                      **RELIEF REQUESTED**

2       WHEREFORE, Plaintiff seeks relief from this Court as follows:

3         a.       For a declaratory judgment that Eberhard's arrest in retaliation for recording peace

4 officers in the performance of their duties and for recording matters of public interest pertaining to

5 the bypass project violated clearly established constitutional rights under the First, Fourth and

6 Fourteenth Amendments to the United States Constitution, and Article 1, §§ 2(a) and 7 of the

7 California Constitution.

8         b.       For a declaratory judgment that gathering information for dissemination to the public,

9 including recording peace officers in the performance of their duties, in the bypass project footprint

10 is not a violation of Penal Code Section 602(k), or any other subdivision thereunder, and therefore

11 Eberhard cannot be arrested for trespass while on the site for the purpose of carrying out his job

12 duties for TWN.

13         c.       An injunction that (i) prohibits CHP from arresting, threatening arrest, detaining,

14 obstructing or otherwise interfering with Eberhard's ability to record matters of public interest,

15 including recording peace officers in the performance of their duties, in the bypass project footprint

16 and elsewhere on public property; (ii) directs CHP and CALTRANS to develop and implement, with

17 the Court's oversight, a comprehensive and effective policy to protect the First Amendment rights of

18 the public and of the press to observe and record matters pertaining to the bypass project, including

19 recording peace officers in the performance of their duties in the bypass project footprint; and, (iii)

20 requires CHP and CALTRANS to undertake training and other prophylactic measures to ensure

21 Defendants' acts are not repeated in the future.

22         d.       General, special, compensatory, actual and statutory damages, to the extent permitted

23 by law, against Defendants jointly and severally, in an amount to be determined by a jury at trial;

24         e.       Punitive damages against Dabbs, Reynolds, Babcock, Epperson, Lott and Fielder

25 and/or Does 1-25, in an amount to be determined by a jury at trial;

26         f.       An award of costs and expenses in prosecuting this action, including reasonable

27 attorney's fees pursuant to 42 U.S.C. §§ 1988 and 2000aa-6(f); Cal. Civ. Proc. Code §§ 52.1 (b) &

28 (h), 52, and 1021.5 and/or any other applicable law;

COMPLAINT

g.  An award of prejudgment and post-judgment interest to the extent permitted by law;

h.  Such other relief that this Court may deem just and proper.

Respectfully submitted,

DATED: March 2.5, 2014          JASSY VICK CAROLAN LLP

By: _____
    Duffy Carolan
    Attorney for Plaintiff
    STEPHEN ERNEST EBERHARD

34

COMPLAINT

CM-010

Duffy Carolan (SBN 154988)
JASSY VICK CAROLAN LLP
401 Montgomery Street  Suite 2301
San Francisco  CA 94104

TELEPHONE NO: 415-539-3399    FAX NO: 415-539-3394
ATTORNEY FOR (Name): STEPHEN ERNEST EBERHARD

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Mendocino
STREET ADDRESS: 100 North State Street
MAILING ADDRESS:
CITY AND ZIP CODE: Ukiah  Ca 95482-4416
BRANCH NAME: Ukiah

CASE NAME:
Stephen Ernest Eberhard v. California Highway Patrol, et al.

ENDORSED-FILED

MAR 27 2014

CLERK OF MENDOCINO COUNTY
SUPERIOR COURT OF CALIFORNIA

JOHN LOZANO

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: SC UK CVPD 14638 |
|---|---|---|---|
| ✓ Unlimited (Amount demanded exceeds $25,000) | Limited (Amount demanded is $25,000 or less) | Counter    Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- Auto (22)
- Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- Asbestos (04)
- Product liability (24)
- Medical malpractice (45)
- Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- Business tort/unfair business practice (07)
- ✓ Civil rights (08)
- Defamation (13)
- Fraud (16)
- Intellectual property (19)
- Professional negligence (25)
- Other non-PI/PD/WD tort (35)

**Employment**
- Wrongful termination (36)
- Other employment (15)

**Contract**
- Breach of contract/warranty (06)
- Rule 3.740 collections (09)
- Other collections (09)
- Insurance coverage (18)
- Other contract (37)

**Real Property**
- Eminent domain/inverse condemnation (14)
- Wrongful eviction (33)
- Other real property (26)

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38)

**Judicial Review**
- Asset forfeiture (05)
- Petition re: arbitration award (11)
- Writ of mandate (02)
- Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- Antitrust/Trade regulation (03)
- Construction defect (10)
- Mass tort (40)
- Securities litigation (28)
- Environmental/Toxic tort (30)
- Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- RICO (27)
- Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- Partnership and corporate governance (21)
- Other petition (not specified above) (43)

2. This case [ ] is  [✓] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a.[✓] monetary  b.[✓] nonmonetary, declaratory or injunctive relief  c.[✓] punitive
4. Number of causes of action (specify): 12
5. This case [ ] is  [✓] is not  a class action suit
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: March 25, 2014

(TYPE OR PRINT NAME)                                   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

FAX FILED

| | |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MENDOCINO<br>100 NORTH STATE ST.<br>UKIAH, CA 95482 | FOR COURT USE ONLY<br><br>MAR 27 2014<br><br>CLERK OF MENDOCINO COUNTY<br>SUPERIOR COURT OF CALIFORNIA<br><br>JOHN LOZANO |
| STEPHEN ERNEST EBERHARD<br>Plaintiff(s)<br><br>vs. | |
| CALIFORNIA HIGHWAY PATROL<br>Defendant(s) | Case Number<br>SC-UK-CV-PO-14-0063802-000 |

# NOTICE OF CASE MANAGEMENT CONFERENCE

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

Notice is given that a Case Management Conference has been scheduled as follows:

| Date: 09/19/2014 | Time: 11:00 A.M. | Department: E |
|---|---|---|

The court will make every effort to ensure that this matter is brought to trial or otherwise disposed of within one year. **All parties must comply with the California Rules of Court.** The court will strictly monitor compliance and will impose **monetary penalties** and may dismiss a complaint or cross-complaint for repeated failures to comply.

1. You must:

   a. **Serve** all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (CRC § 3.110(b));

   b. **Give notice** of this conference to any party not included in this notice and file proof of service;

   c. **Meet and confer,** in person or by telephone, to consider each of the issues identified in CRC § 3.724 no later than **30** calendar days before the date set for the Case Management Conference;

   d. **File and serve** a completed Case Management Conference Statement (use of Judicial Council Form CM-110 is **mandatory**) at least **15** days before the Case Management Conference (CRC § 3.725).

2. You are further ordered to appear in person at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed. Telephonic appearances at Case Management Conference may be available, pursuant to Local Rule 11.1.

3. Each party must file a statement before the trial date indicating whether the party requests the presence of an official court reporter. Proceedings of less than one hour in duration will be reported without cost to any party.

☐ Copy given to Cross-complainant

Date: March 27, 2014                    JAMES B. PERRY, Interim Clerk of the Court

JOHN LOZANO

John Lozano, Deputy Clerk