UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN E. EBERHARD,<br>       Plaintiff,<br>    v.<br>CALIFORNIA HIGHWAY PATROL, et al.,<br>       Defendants. | Case No. 3:14-cv-01910-JD<br><br>**ORDER RE SUMMARY JUDGMENT**<br>Re: Dkt. No. 109 |

Plaintiff Stephen Eberhard is a journalist. In 2013, Eberhard reported for The Willits News newspaper on a Caltrans highway construction project known as the Willits Bypass Project. The project was locally controversial and drew a number of protests from environmentalists and others. Eberhard alleges that defendant California Highway Patrol ("CHP") and its individual officers targeted him for harassment for covering the project story. The harassment involved, among other allegations, a physical encounter with CHP Officer Teddy Babcock in May 2013, and an arrest for trespassing in July 2013 by CHP Officers Christopher Dabbs and Kory Reynolds.

Eberhard initially brought a barrage of claims against defendants under a number of theories and statutes. The Court dismissed several claims in prior orders, s*ee* Dkt. Nos. 49, 79, but allowed a set of claims alleging that the CHP officers were motivated by retaliatory intent against Eberhard as a journalist and that they arrested and detained him falsely and without probable cause. *See* Third Amended Complaint, Dkt. No. 97. Related claims for supervisory liability against the CHP and CHP Captain James Epperson also survived the pleadings challenges.

Now that the evidence is in, the CHP and the individual officers move for summary judgment on the merits or for qualified immunity. Mot. For Summary Judgment, Dkt. No. 109. The Court finds that the arresting officers, Dabbs and Reynolds, are entitled to immunity on the

Fourth Amendment and state false arrest claims. The Court also finds that summary judgment is warranted on the Privacy Protection Act claims and all claims against Captain Epperson. But Eberhard's First Amendment and related California Bane Act claims involve fact disputes that only a jury can decide. Summary judgment is denied on those claims, and they will be set for jury trial.

## BACKGROUND

Eberhard is a photojournalist for The Willits News ("TWN"), a newspaper in Willits, California. Dkt. No. 97 ¶ 5; Dkt. No. 124-3 ¶ 2. He holds press credentials from the California Sheriff's Office, the County of Mendocino and The Willits News, which he conspicuously displays on lanyards when he is newsgathering. *Id.* His photographs and reports on local events have been published and cited by TWN and other news organizations such as the Santa Rosa Press Democrat, ABC-7 television, and the San Francisco Chronicle. Dkt. No. 97 ¶ 19.

In 2013, Eberhard actively reported on the Willits Bypass Project, a highway construction project involving a 5.9 mile long, four-lane freeway around Willits. *Id*. ¶ 13, 20. The project is overseen by the California Department of Transportation ("Caltrans"). At around the time the project started in early 2013, Caltrans undertook apparently routine efforts to limit access to the site to Caltrans employees and others authorized by Caltrans. *Id*. at ¶ 6. Among other steps, Caltrans posted "No Trespassing" signs at several locations along the project to restrict access. Dkt. No. 110-4. Caltrans contracted with the CHP to enforce these restrictions, among other tasks. Dkt. No. 128-8.

The project was locally controversial. Environmental advocates strongly criticized it as unduly destructive of the wetlands habitat in the Little Lake Valley where it is sited, and of the cultural resource sites of local Native American tribes. Dkt. No. 97 ¶¶ 13-15. The project was challenged in other lawsuits and has seen protests ranging from picketing in the public right-of-way along Highway 101 to direct actions in which individuals entered the site and chained themselves to trees and construction equipment. *Id.* ¶ 16. The CHP has made more than 50 arrests at the site. *Id*.

Media coverage of the project and protests generated some tensions.  Captain Epperson, the CHP's senior officer for the project, expressed the view that the press coverage was "counterproductive" and "actually assisting the protestors." *See* Dkt. No. 127-7.  Eberhard alleges that Captain Epperson also barred the press from the work site for a time, telling Caltrans official Matt McKeon that if he brought the press onto the site to witness a planned enforcement action CHP would "shut down the operation." Dkt. No. 124-3 ¶ 16.  Eberhard acknowledges that he shared information collected in the course of his journalism with groups protesting the Willits Bypass. *Id.* ¶ 8.

To reduce potential flashpoints, the parties made some effort to work out a modus vivendi.  The record indicates that Caltrans implemented a protocol to give media access to the project when accompanied by a Caltrans escort.  *See, e.g.*, Dkt. No. 110-21.  For Eberhard specifically, Caltrans agreed that it would facilitate the escort requirement as much as reasonably possible by giving him a number of ways to contact a Caltrans representative to meet at the site.  *See* Dkt. No. 110-17.  Eberhard understood that he did not have Caltrans authorization to be on the site without an escort.  Dkt. No. 110-1 at 99:4-6.  And Caltrans advised the TWN that Eberhard would be subject to arrest for trespassing if he entered the site unescorted.  Dkt. No. 110-21.

Despite these efforts, the conflicts that lie at the heart of this case erupted.   Eberhard alleges that, in April and May 2013, Officer Babcock interfered with his reporting on several occasions by aggressively questioning his right to be at the Willits project site, yelling at Eberhard to "get away" from an arrest that was taking place in the public right of way and ordering Eberhard to a location where he could neither readily see nor photograph the arrestee, and threatening a colleague of Eberhard by saying "[y]ou're going to jail in about a minute." Dkt. No. 124-3 ¶ 12.  On May 21, 2013, the interaction with Officer Babcock escalated into a physical confrontation in which Babcock shoved Eberhard when he tried to photograph the driving of piles on the Willits Bypass site, even though Caltrans had authorized the photos.  *See id*. ¶ 13.

A few months later, on the morning of July 23, 2013, CHP officers arrested Eberhard during a protest on the project site. Dkt. No. 97 ¶¶ 56-70.  Eberhard was cuffed and held in a patrol car, and eventually taken to the Mendocino County Jail, where he was booked and locked in

3

a cell for two hours before being released. *Id.* ¶ 67. His cameras were seized during the arrest and stored at the Ukiah office of the CHP, where Eberhard retrieved them upon his release. *Id.* ¶ 67-68. No charges were filed against Eberhard and he was not prosecuted for any conduct relating to the arrest or the Willits Bypass project generally. *Id.* ¶ 70.

## DISCUSSION

The Court may grant summary judgment on a claim or defense only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A moving party without the ultimate burden of persuasion at trial -- usually, but not always, a defendant -- has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To meet this burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). But the non-moving party bears the task of identifying with reasonable particularity the evidence that precludes summary judgment. *Simmons v. Navajo County*, 609 F.3d 1011, 1017 (9th Cir. 2010). The Court has no obligation to review the record on the non-moving party's behalf. *Id*.

### I. THE FOURTH AMENDMENT AND FALSE ARREST CLAIMS

#### A. The Federal Arrest Claims

The CHP defendants contend that Officers Dabbs and Reynolds are entitled to qualified immunity on the Fourth Amendment claims arising from Eberhard's arrest. "Qualified immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). An officer is entitled to qualified immunity unless the facts viewed most favorably to the plaintiff show that (1) the officer violated a constitutional right; and (2) that right was clearly

4

established at the time of the alleged misconduct. *Ford v. City of Yakima*, 706 F.3d 1188, 1192 (9th Cir. 2013) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223, 233 (2009)); *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007) (same).

"The linchpin of qualified immunity is the reasonableness of the official's conduct." *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1075 (9th Cir. 2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987)). Qualified immunity does not demand absolute perfection from officers in the performance of their duties. It recognizes the challenges and uncertainties inherent in police work and affords a margin of error that allows officers to be "'reasonably unreasonable.'" *Id*. at 1076 n.1 (internal citation omitted); *see also Pearson*, 555 U.S. at 231 ("The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.") (internal quotation omitted). So long as the challenged conduct was objectively reasonable in light of the legal rules prevailing at the time it occurred, the officer will be immune from suit. *See Rosenbaum*, 663 F.3d at 1075-76 (quoting *Anderson*, 483 U.S. at 638-39).

Our circuit has provided substantial guidance on determining qualified immunity in the Fourth Amendment context. As an initial matter, the Fourth Amendment protection against unreasonable searches and seizures already builds in an allowance for reasonable error even before a qualified immunity analysis. *Rosenbaum*, 663 F.3d at 1076 n.1; *see also Heien v. North Carolina*, 135 S.Ct. 530, 536 (2014) ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'") (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). A qualified immunity analysis in the search and seizure context should reflect the Fourth Amendment's inherent reasonableness standards.

In our circuit, the test for qualified immunity in the arrest context is (1) whether there was probable cause for the arrest and, if not, (2) "whether it is *reasonably arguable* that there was probable cause for arrest -- that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Rosenbaum*, 663 F.3d

5

at 1076 (emphasis in original).  While "it is well established that 'an arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983,'" an officer who makes an arrest without probable cause may still be entitled to qualified immunity if he or she reasonably believed probable cause existed. *Id*. (quoting *Bortunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1988)); *see also Blankenhorn*, 485 F.3d at 471-72 (same).  "Even if the arrest was made without a warrant and without probable cause, however, the officer may still be immune from suit if it was objectively reasonable for him *to believe* that he had probable cause." *Rosenbaum*, 663 F.3d at 1078 (citing *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009)) (emphasis in original).

Probable cause to arrest without a warrant exists when the facts and circumstances within the officers' knowledge are enough for a reasonable person to conclude that the suspect has committed a crime. *Id*. at 1076; *see also Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001) ("Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime.").  "The analysis involves both the facts and the law.  The facts are those that were known to the officer at the time of the arrest.  The law is the criminal statute to which those facts apply." *Rosenbaum*, 663 F.3d at 1076.

Even when viewed most favorably to Eberhard, the facts show that the CHP officers reasonably believed they had probable cause to arrest him.  Officers Dabbs and Reynolds arrested Eberhard for trespass under California Penal Code Section 602, which has a number of detailed subsections addressing different trespass situations.  In general terms, Section 602(k) states that a person is trespassing when entering any lands, whether unenclosed or enclosed, for the purpose of injuring any property or property rights or interfering with the lawful use of the land by the owner or lawful possessor.  Section 602(l) states trespass occurs when entering any lands enclosed by a fence or unfenced lands with posted no-trespassing signs without the written permission of the owner of the land or the owner's agent, and refusing to leave the lands immediately upon the owner's or agent's request.  And Section 602(o) finds trespass when refusing to leave land belonging to or lawfully occupied by another and not open to the general public after a request to

leave by (1) a peace officer, upon being informed by the peace officer that he or she is acting at the request of the owner, the owner's agent, or the person in lawful possession, or (2) by the owner, the owner's agent, or the person in lawful possession.

The key facts about the arrest are undisputed for the most part and show why the CHP officers reasonably believed Eberhard was trespassing. In the arrest report, Officer Dabbs stated that the area in which Eberhard had been arrested was fenced off from the public. *See* Dkt. No. 110-30 at 4 (Eberhard encountered "50 yards inside of the fenced construction area."). Additionally, both Dabbs and Reynolds testified that they knew before the day of the arrest that the site was marked off by no-trespassing signs. Dkt. No. 110-14 at 54:25-55:7 ("I know [the no trespassing signs] were there [in July]"); Dkt. No. 110-15 at 180:8-13 ("[the signs] were up from the beginning … when they fenced [the site] off they put the signs up."). All CHP officers working the Willits site in July 2013 were advised that Caltrans "ha[d] posted three no trespassing signs along every mile of the project and no trespassing signs at every known road and every known trail entrance to the property" and that Caltrans had also erected fencing throughout the construction site. *See* Dkt. No. 110-13 at CHP000434; Dkt. No. 110-5 ¶ 15.

Officers Dabbs and Reynolds also testified that they knew Eberhard needed an escort to be on the site. *See* Dkt. No. 110-15 at 70:1-4 ("Q. Were you ever told that members of the media couldn't be on the site without a Caltrans escort anytime before Mr. Eberhard's arrest? A. Yes."); Dkt. No. 110-14 at 65:6-7 ("I remember hearing [that Eberhard] needed to have an escort, and I think a vest and hard hat" to enter the site). Reynolds testified that on the morning of the arrest, he asked a Caltrans worker "if Mr. Eberhard had an escort or permission to be on the property," and the worker replied "no, he did not." Dkt. No. 110-15 at 127:18-22. And, finally, the officers knew that Eberhard had been asked to leave -- even in Eberhard's telling, Officer Dabbs did in fact ask him to leave. *See* Dkt. No. 124-3 ¶ 20 (Dabbs "told me that I was going to have to leave").

Eberhard does not dispute the material facts in any meaningful way. He admits that he had seen posted "no trespassing" signs fencing off the site. Dkt. No. 110-1 at 41:18-22 ("Q: Did you ever see any no trespassing signs out at the Willits bypass project? A: Yes, sir. Q: What did you think that meant? A: I think it means to keep out."). He knew he did not have Caltrans

7

authorization to be at the site without an escort, *id*. at 99:4-6, but was there on the day of his arrest without one, Dkt. No. 124-4 at 181:7-182:14.  He had been cautioned about trespassing on prior visits, Dkt. No. 110-1 at 171:3-5, and Caltrans sent his employer, the TWN, an email in May 2013 reiterating the escort policy and warning specifically that Eberhard would be subject to arrest if he entered unescorted, Dkt. No. 110-21.  He had been specifically requested to leave the site on the day of the arrest before he was detained.  Dkt. No. 97 ¶ 57.

Under the totality of these circumstances, which were known to all the key players, Officers Dabbs and Reynolds reasonably believed they had probable cause to arrest Eberhard for trespass.  Consequently, they are entitled to qualified immunity.  It is certainly true that Eberhard's ultimate liability for violating Penal Code Section 602 can be questioned.  Whether Eberhard actually violated Section 602(k) -- which requires intent to "injur[e] any property or property rights of the owner… or interfer[e] with… any lawful business or occupation carried on by the owner of the land" -- is rather doubtful.  The 9th Circuit has found that "[t]he California Penal Code does not define 'injury to property'" and expressed skepticism that entering property without permission could, without more, constitute injury to property rights.  *Blankenhorn*, 485 F.3d at 474.  And given Eberhard's known status as a journalist, it is difficult to put stock in the CHP's speculation that the arrest survives scrutiny because "a reasonable officer might even have believed that Eberhard intended to aid the protesters in some way."  Dkt. No. 109 at 14.  But whether a conviction could be sustained against Eberhard is not the driving inquiry for probable cause or qualified immunity.  Under the largely undisputed facts and circumstances surrounding the arrest, the CHP officers reasonably concluded that Eberhard was in the wrong place at the wrong time and subject to arrest for trespass.  That Eberhard was specifically booked under Section 602(k) is of no moment.  As the Ninth Circuit held, "[i]t doesn't matter … if [the arrestee] was charged with a different crime than that for which he was arrested … 'Probable cause need only exist as to any offense that could be charged under the circumstances.'"  *Id*. at 473 (quoting *Bingham v. City of Manhattan Beach,* 341 F.3d 939, 950 (9th Cir. 2003)).

Eberhard suggests that qualified immunity should not be found because a reasonable officer would have known that he had a statutory privilege under California Penal Code § 409.5 to

8

be present at the site. That goes too far. Section 409.5 addresses the closure of disaster areas that pose "a menace to the public health or safety" such as floods, storms, earthquakes, fires and similar disasters. Cal. Penal Code § 409.5(a). It allows law enforcement officers to bar access to a disaster site to protect the public health and to close the "immediate area" around a command post set up to handle a civil riot or disturbance. *Id.* at § 409.5(a)-(b). Section 409.5(d) provides that accredited media may obtain access to areas closed under the statute. *Id*. at § 409.5(d).

Nothing in Section 409.5 would have put a reasonable officer on notice that Eberhard could not be arrested for trespass. The statute on its face certainly does not contemplate automatic application to a Caltrans project like the Willits Bypass, and Eberhard does not explain how the press access provision in Section 409.5(d) makes sense in that context. While Eberhard points to some evidence that the CHP thought about whether Section 409.5 might be in play, *see* Dkt. No. 123-4 at 15 n.18, he does not show that the CHP actually invoked the statute to implement any on-site practices at the project or issue orders to field officers like Dabbs or Reynolds. In addition, it was well established in July 2013 that "'[n]ewsmen have no constitutional right to access the scenes of crime or disaster when the general public is excluded,'" and Section 409.5 does not provide Eberhard with a superior right. *Chavez v. City of Oakland*, 414 Fed. Appx. 939, 940 (9th Cir. 2011) (quoting *Houchins v. KQED*, 438 U.S. 1, 10-11 (1978)). To the extent Eberhard contends reasonable officers would have believed that journalists enjoy special access privileges above and beyond other citizens, he is wrong. *See id*.; *see also Pell v. Procunier*, 417 U.S. 817, 833 (1974) ("the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally."); *Branzburg v. Hayes* 408 U.S. 665, 684-85 (1972) (journalists "have no constitutional right of access to the scenes of crime or disaster when the general public is excluded"); *Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 58 (1st Cir. 2008) ("The First Amendment does not grant the press a special right of access to property beyond the public domain.").

### B. The State False Arrest Claims

The same facts drive dismissal of Eberhard's false arrest claims under California law. Because qualified immunity is a federal doctrine, it does not apply to California state law claims.

1  *Venegas v. Cnty. of Los Angeles*, 153 Cal. App. 4th 1230, 1243 (2007) (citing *Ogborn v. City of*

2  *Lancaster*, 101 Cal. App. 4th 448, 460 (2002)).  An equivalent state law immunity is available

3  under California Penal Code § 847(b), which states that an officer cannot be held liable for false

4  imprisonment where the officer, "acting within the scope of his or her authority," made a "lawful"

5  arrest or "had reasonable cause to believe the arrest was lawful."

6        Section 847(b) "contains principles that parallel the [federal qualified] immunity analysis."

7  *O'Toole v. Superior Court*, 140 Cal. App. 4th 488, 510 (2006).  Like federal qualified immunity,

8  the statute immunizes officers from false arrest claims where there is "reasonable cause to believe

9  the arrest was lawful," which California courts have defined as existing when "the facts known to

10  the arresting officer would lead a reasonable person to have a strong suspicion of the arrestee's

11  guilt."  *Id.* at 511; *People v. Mower*, 28 Cal. 4th 457, 473 (2002).  Like federal qualified immunity,

12  the test for "reasonable cause" is an objective one, and does not require the Court to inquire into

13  the arresting officer's state of mind.  *O'Toole,* 140 Cal. App. 4th at 512.

14        As discussed, Officers Dabbs and Reynolds reasonably believed they had probable cause

15  to arrest Eberhard.  Consequently, state law immunity applies under Section 847(b).

16  **II.  THE FIRST AMENDMENT AND RELATED CALIFORNIA BANE ACT CLAIMS**

17      **A.  The July 2013 Arrest**

18        Eberhard's First Amendment claims will go to trial.  Even if an arrest is supported by

19  probable cause, a federal claim is stated when the officer's motivation was to retaliate against the

20  exercise of First Amendment rights.  In our circuit, "an individual has a right 'to be free from

21  police action motivated by retaliatory animus but for which there was probable cause.'"  *Ford v.*

22  *City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013) (quoting *Skoog v. Cnty of Clackamas*, 469

23  F.3d 1221, 1235 (9th Cir. 2006)); *see also Martin v. Naval Criminal Investigative Serv.*, 539 Fed.

24  Appx. 830, 832 (9th Cir. 2013) ("Our precedent has long provided notice to law enforcement

25  officers that it is unlawful to use their authority to retaliate against individuals for their protected

26  speech . . . even if probable cause exists for the challenged law enforcement conduct") (internal

27  citation and quotation omitted); *Morse*, 2014 WL 572352 at *12 (N.D. Cal. Feb. 11, 2014) (same).

28  To state a First Amendment retaliation claim, the evidence must show that (1) the officer's

10

1  conduct would chill a person of ordinary firmness from future First Amendment activity; and (2)
2  the officer's desire to chill speech was a but-for cause of the challenged conduct. *Ford*, 706 F.3d
3  at 1193 (citing *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 916-17 (9th Cir. 2012) (en banc)).[1] Being
4  arrested or threatened with arrest is enough to show the likelihood of a First Amendment chill.
5  *Ford,* 706 F.3d 1188, 1193 ("[t]his Court has recognized that a retaliatory police action such as an
6  arrest or search and seizure would chill a person of ordinary firmness"). The CHP does not
7  dispute that reporting on controversial public works projects like the Willits Bypass is a
8  quintessential protected First Amendment activity.

9        The parties offer competing fact narratives about a possible retaliatory cause of the arrest
10  that preclude summary judgment. On the one hand, Eberhard has proffered evidence that might
11  enable him to prove retaliatory intent on the officers' part. Among other facts, Eberhard has
12  shown that he was known to the arresting officers as a journalist and as an individual who had
13  clashed with the CHP and Caltrans while working as a reporter. Specifically, Officers Dabbs and
14  Reynolds and their Sergeant, Steve Lott, knew before the arrest that Eberhard was a
15  photojournalist with TWN, Dkt. No. 125-1 at 103:3-11; Dkt. No. 125-2 at 83:18-84:12; Dkt. No.
16  125-3 at 87:12-13; Dkt. No. 110-12 at 88:5-7, and were aware of Eberhard's ongoing public
17  criticism of and conflicts with CHP, which Sergeant Lott likened to a "boxing match". Dkt. No.
18  97 ¶¶ 26, 54. On the day of the arrest, the officers knew that Eberhard was on site to gather news
19  about the protest. *See* Dkt. No. 125-1 at 103:3-11 (acknowledging that Eberhard introduced
20  himself as a journalist with The Willits News immediately prior to the arrest), 103:12-24
21  (Eberhard carried two cameras and what appeared to be a press pass on a lanyard). After the
22  arrest, when Eberhard complained that he was in pain from the pressure the handcuffs were

---

[1] The CHP's passing reference to the Supreme Court's recent holding in *Reichle v. Howards*, 132 S. Ct. 2088 (2012), *see* Dkt. No. 109 at 16, does not change the First Amendment test or analysis. The Ninth Circuit issued *Ford* after *Reichle* and held under circuit precedent that it has been unlawful since 1990 to retaliate against individuals for their protected speech. *Ford*, 706 F.3d at 1195. Nothing in *Reichle* pre-empts that holding. And while the Court may not be bound by circuit precedent when there is an intervening and clearly irreconcilable Supreme Court opinion, *see Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc), the CHP has not shown that *Reichle* displaces our circuit's case law on this issue or that this Court may refuse to follow a precedential Ninth Circuit opinion based on a Supreme Court decision that predates it.

placing on his shoulder, Officer Dabbs told him "[y]ou should have thought about that before you walked out here." Dkt. No. 124-3 ¶ 26. And when Eberhard protested to Sergeant Lott that he was just trying to do his job as a journalist, Eberhard states that Lott smiled and "said he had heard about [the] prior incidents" with Officer Babcock. *Id*. Eberhard also states that he was arrested, booked and placed in a cell when other alleged trespassers were only cited and released. *Id.* ¶ 26 n.4.

On the other hand, the CHP defendants sponsor evidence that might establish a non-retaliatory explanation for the interactions with Eberhard. On the day of the arrest, defendants say a decision had been made to take all arrestees to jail and that Eberhard was not singled out. *See* Dkt. No. 110-22 ¶ 5 ("Mr. Eberhard was taken to jail because we were told to take all the persons arrested at the Willits Bypass Project to jail."). They state that Eberhard was cuffed and jailed because of concerns specific to him. *See, e.g.,* Dkt. No. 110-23 ¶ 5 ("I did not believe that citation would have been appropriate in the circumstances of this case given what we were told to do and Mr. Eberhard's ignoring of the trespass laws on multiple occasions"); Dkt. No. 110-30 at 1 (Eberhard was incarcerated because he "would be reasonably likely to continue the offense or offenses, or the safety of persons or property would be imminently endangered if [plaintiff was] immediately released"). They state that access to the site was restricted for safety and not anti-media reasons. *See* Dkt. No. 110-17 at 1 (Willits Bypass site closed "due to safety concerns for reporters, construction workers, and the motoring public"). And as previously discussed, they offer other evidence showing that Eberhard knew he was in an access-restricted area, was not complying with the site escort protocol, and was uncooperative with the officers when challenged on that.

The competing facts and inferences in these narratives are enough to deny summary judgment. Eberhard has set forth enough for a rational jury to find that his First Amendment rights were chilled and that the officers acted out of a desire to cause a chill. The First Amendment claims for the arrest will proceed to trial.[2]

---

[2] The CHP does not argue for qualified immunity in the First Amendment context, and offers no case law or other considerations on that issue. Even if it had, qualified immunity would almost

### B. The April and May 2013 Incidents

The First Amendment claims arising out of Eberhard's interaction with Officer Babcock in April and May of 2013 will also go to trial. Defendants do not contend that Officer Babcock's conduct could not in itself constitute a First Amendment violation. Rather, they argue that his "motivations" were not to chill speech. Dkt. No. 109 at 21-22.

On that issue, the record again shows that trial is warranted. Eberhard states that he and Babcock first clashed on April 17, 2013, when Eberhard was waiting for his Caltrans escort in order to enter the work site. According to Eberhard, Babcock was agitated and demanded to know "What are you doing here? What's going on? You can't be here." Dkt. No. 124-3 ¶ 12; Dkt. No. 123-4 at 10. Approximately one month later, on May 13, 2013, while Eberhard was attempting to photograph an arrestee through the front window of a patrol car, Babcock again intervened, shouting "[g]et away from there! Get away from there!", and demanding that Eberhard relocate to an area where he could neither see nor photograph the arrestee. Dkt. No. 124-3 ¶ 12. Later that afternoon, while Eberhard was attempting to photograph the arrest of another protestor, Babcock turned to a nearby reporter colleague who was filming the arrest and shouted "[y]ou're going to jail in about a minute." Dkt. No. 110-1 at 117:4-9. According to Eberhard, this pattern of hostile interaction culminated on May 21, 2013, when Eberhard was escorted onto the Willits Bypass project site by a Caltrans employee, Matt McKeon, to photograph the driving of the first piles. Dkt. No. 124-3 ¶ 13. Officer Babcock complained to McKeon about "the press being there." *Id.* After the pile driving began, Eberhard says that he had McKeon's permission to enter the roped-off area around the pile to take closer photographs, but that Babcock charged Eberhard and yelled at him to leave. *Id.* Eberhard started to leave, but as he turned to take a photograph from the rope line, Babcock ran up and shoved him twice on the shoulder while shouting. *Id.* Eberhard claims that he was the only individual within the safety enclosure who was asked to leave, and the only one subjected to physical force. *Id.*

---

certainly not exist here because of the long notice to police that it is unlawful to retaliate for First Amendment activity. *Ford*, 706 F.3d at 1195.

For their part, CHP defendants offer evidence from which a jury could find that Officer Babcock was motivated by concern for Eberhard's safety, and not a desire to chill his First Amendment rights. Eberhard admits that was asked to move on May 13 because he was standing between two parked cars, and that Officer Babcock told him that "[i]f a vehicle hit this car, you could get smashed between the two cars." *See* Dkt. No. 110-1 at 50:19-20. The roped-off area that Babcock pushed Eberhard out of had signs saying "Stay Back, Dangerous Area," and the individuals who were permitted to stay in the area were wearing Caltrans hard hats. Dkt. No. 110-24 at 160:18-22; *see* Dkt. No. 127-8 (showing hard hats). The CHP proffers these and other facts to show Officer Babcock's interactions with Eberhard were "all about standing somewhere the officer believed unsafe." Dkt. No. 109 at 22.

These and other evidentiary proffers by the parties raise disputes of credibility and material fact that a jury must decide. The First Amendment claims against Officer Babcock will therefore proceed to trial.

**C. The California Bane Act Claims**

For largely the same reasons, Eberhard's First Amendment claims under the Bane Act will go to a jury. The Bane Act prohibits interference with an individual's rights under federal or California law by "threats, intimidation, or coercion." Cal. Civ. Code § 52.1; *see also O'Toole*, 140 Cal. App. 4th at 501-02 (same). The focus is on whether the challenged conduct amounts to an intentional or "knowing and blameworthy interference with the plaintiffs' constitutional rights." *Gant v. Cnty. of Los Angeles*, 772 F.3d 608, 623-24 (9th Cir. 2014) (citing *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947 (2012)); *see also Cuviello v. City and Cnty. of San Francisco*, 940 F. Supp. 2d 1071, 1103 (N.D. Cal. 2013) (Bane Act applies to intentional interference with First Amendment rights).

As shown, the record raises disputed questions of fact on the issue of whether the officers intentionally interfered with Eberhard's First Amendment activities through conduct that qualifies as "threats, intimidation, or coercion." Consequently, summary judgment is denied on the Bane Act claims.

14

## III. THE PRIVACY PROTECTION ACT CLAIM

Eberhard's claim under the federal Privacy Protection Act, 42 U.S.C. § 2000aa(a) ("PPA"), is dismissed. The PPA "'generally prohibits government officials from searching for and seizing documentary materials possessed by a person in connection with a purpose to disseminate information to the public.'" *Morse v. Regents of University of California, Berkeley*, 821 F. Supp. 2d 1112, 1120 (N.D. Cal. 2011) (quoting *Citicasters v McCaskill*, 89 F.3d 1350, 1353 (8th Cir. 1996)). Eberhard appears to contend, in less than clear fashion, that the short-term storage of his cameras and notebook after his arrest violated the PPA.

Both parties make only the barest mention of the PPA claim and neither offers any case law or statutory interpretation for it. Largely for the sake of clarifying the issues set for trial, the Court addresses the claim. The undisputed facts pertinent to the PPA raise serious doubts about its application in this case. Eberhard does not allege that his cameras and notebook were targeted for seizure by the CHP or that the CHP searched or viewed their contents in any respect. Officer Dabbs testified that that the cameras and notebook were taken to the CHP office "mainly for his safekeeping … so that they weren't damaged at the jail" after the decision had been made to arrest Eberhard. Dkt. No. 125-1 at 129:22-130:18. Eberhard has not provided any evidence that meaningfully challenges this good faith reason for the protective seizure of his materials and does not offer any case law condemning, under the PPA, the custodial storage of personal property incident to arrest. Because there is no material fact dispute on this issue and no case law supporting Eberhard's PPA claim, it is dismissed.

## IV. THE SUPERVISORIAL LIABILITY CLAIMS

### A. Captain Epperson

The claims seeking to impose supervisorial liability on Captain Epperson are also unavailing. Under Section 1983, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also Simmons v. Navajo County*, 609 F.3d 1011, 1020 (9th Cir. 2010) (same). Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft*, 556 U.S. at

15

676. A supervising officer like Captain Epperson may be held liable in his individual capacity only if he "was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." *Edgerly v. City and Cnty. of San Francisco*, 599 F.3d 946, 961 (9th Cir. 2010). California state law is conceptually similar. "Except as otherwise provided by statute, a public employee is not liable for an injury caused by the act or omission of another person." Cal. Gov't Code § 820.8.

Eberhard has not provided enough evidence for a rational jury to find Captain Epperson liable in this case. Eberhard has not shown that Captain Epperson was personally involved in any direct way with the yelling and shoving incidents with Officer Babcock in April and May 2013, or Eberhard's arrest in July 2013. He points mainly to an email in which Captain Epperson says that media access to the work site "may be counterproductive and actually assisting the protestors," Dkt. No. 127-7, and testimony suggesting that Captain Epperson knew about confrontations between Officer Babcock and Eberhard and failed to reprimand Babcock, *see* Dkt. No. 123-7 at 179:21-25. Even taken as true, these minor events happened in the background of Eberhard's direct interactions with CHP officers in the field and are far too thin a basis on which to hold Captain Epperson responsible under a supervisorial liability theory.

### B. The CHP

The liability of the CHP as a public entity is more nuanced. On the federal side, because *respondeat superior* does not apply, the CHP may be liable for a Section 1983 claim only if it maintained customs or policies that caused a constitutional tort. *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691 (1978). Customs or policies mean what they suggest -- regular practices of unconstitutional conduct that can be fairly attributed to a public entity. *Gant*, 772 F.3d at 618. A few incidents or events do not add up to a custom or policy. *Id*. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id*. (internal quotation omitted).

Eberhard does not set forth any evidence indicating that his First Amendment claims are attributable to a CHP custom or policy. He points at most to possibly unconstitutional conduct by

16

three individual officers over a compact time frame. He does not show any evidence linking that conduct to a CHP policy or practice -- in fact, he cites evidence indicating that the CHP's aim was to avoid arresting reporters. *See* Dkt. No. 123-7 at 231:21-22; Dkt. No. 123-4 at 12 (discussing "directive from the chief" not to arrest reporters). The Section 1983 claims will proceed against the individual officers, but the CHP is entitled to judgment on them as a public entity.

The California state law outcome on entity liability is different. In California, a "'public entity, as the employer, is generally liable for the torts of an employee committed within the scope of employment if the employee is liable.'" *Garcia v. City of Merced*, 637 F. Supp. 2d 731, 747 (E.D. Cal. 2008) (internal citation omitted); *see also* Cal. Gov't. Code § 815.2(a) and § 820; *Scott v. Cnty. of Los Angeles*, 27 Cal. App. 4th 125, 140 (Cal. Ct. App. 1994) (same). Consequently, the CHP can be held liable if its officers committed acts in violation of state law without immunity. Since the individual officers are not immune for the First Amendment claims under the Bane Act, the CHP may be subject to liability along with them, and so summary judgment is denied on this issue.

## CONCLUSION

Judgment will be entered for defendants on the claims for: (1) Fourth Amendment violations and false arrest, namely Claims Three, Six, and Nine; and (2) the Privacy Protection Act, Claim Five. In addition, judgment will be entered for Captain Epperson on Count Four and all other claims.

Summary judgment is denied on the claims based on the First Amendment, namely Claims One, Two, Seven, and Eight. Those claims will go to a jury trial.

**IT IS SO ORDERED.**

Dated: November 9, 2015

_____
JAMES DONATO
United States District Judge